EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE SEARCH OF:      )
                                   )    Case No.
LOCATIONS WITHIN THE PREMISES   )
TO BE SEARCHED IN ATTACHMENT A  )   **Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41 FOR A**
**WARRANT TO SEARCH AND SEIZE**

I, ▮▮▮▮▮▮▮▮, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     The government is conducting a criminal investigation concerning the improper removal and storage of classified information in unauthorized spaces, as well as the unlawful concealment or removal of government records.  The investigation began as a result of a referral the United States National Archives and Records Administration (NARA) sent to the United States Department of Justice (DOJ) on February 9, 2022, hereinafter, "NARA Referral."  The NARA Referral stated that on January 18, 2022, in accordance with the Presidential Records Act (PRA), NARA received from the office of former President DONALD J. TRUMP, hereinafter "FPOTUS," via representatives, fifteen (15) boxes of records, hereinafter, the "FIFTEEN BOXES."  The FIFTEEN BOXES, which had been transported from the FPOTUS property at 1100 S Ocean Blvd, Palm Beach, FL 33480, hereinafter, the "PREMISES," a residence and club known as "Mar-a-Lago," further described in Attachment A, were reported by NARA to contain, among other things, highly classified documents intermingled with other records.

2.     After an initial review of the NARA Referral, the Federal Bureau of Investigation (FBI) opened a criminal investigation to, among other things, determine how the documents with

1

classification markings and records were removed from the White House (or any other authorized location(s) for the storage of classified materials) and came to be stored at the PREMISES; determine whether the storage location(s) at the PREMISES were authorized locations for the storage of classified information; determine whether any additional classified documents or records may have been stored in an unauthorized location at the PREMISES or another unknown location, and whether they remain at any such location; and identify any person(s) who may have removed or retained classified information without authorization and/or in an unauthorized space.

3.      The FBI's investigation has established that documents bearing classification markings, which appear to contain National Defense Information (NDI), were among the materials contained in the FIFTEEN BOXES and were stored at the PREMISES in an unauthorized location.  Since the FIFTEEN BOXES were provided to NARA, additional documents bearing classification markings, which appear to contain NDI and were stored at the PREMISES in an unauthorized location, have been produced to the government in response to a grand jury subpoena directed to FPOTUS's post-presidential office and seeking documents containing classification markings stored at the PREMISES and otherwise under FPOTUS's control.  Further, there is probable cause to believe that additional documents that contain classified NDI or that are Presidential records subject to record retention requirements currently remain at the PREMISES.  There is also probable cause to believe that evidence of obstruction will be found at the PREMISES.

4.      I am a Special Agent with the FBI assigned to the Washington Field Office ██████████████████████████████████████.  During this time, I have received training at the FBI Academy located at Quantico, Virginia, specific to counterintelligence and espionage investigations.  ████████████████████████████████████████.

Based on my experience and training, I am familiar with efforts used to unlawfully collect, retain, and disseminate sensitive government information, including classified NDI.

5.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1100 S Ocean Blvd, Palm Beach, FL 33480, the "PREMISES," as further described in Attachment A, for the things described in Attachment B.

6.      Based upon the following facts, there is probable cause to believe that the locations to be searched at the PREMISES contain evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793(e), 1519, or 2071.

## SOURCE OF EVIDENCE

7.      The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, and information obtained from other FBI and U.S. Government personnel.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I, or others, have learned during the course of this investigation.

## STATUTORY AUTHORITY AND DEFINITIONS

8.      Under 18 U.S.C. § 793(e), "[w]hoever having unauthorized possession of, access to, or control over any document . . . or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted" or attempts to do or causes the same "to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee

of the United States entitled to receive it" shall be fined or imprisoned not more than ten years, or both.

9.      Under Executive Order 13526, information in any form may be classified if it: (1) is owned by, produced by or for, or is under the control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Order [Top Secret, Secret, and Confidential]; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security.

10.     Where such unauthorized disclosure could reasonably result in damage to the national security, the information may be classified as "Confidential" and must be properly safeguarded.  Where such unauthorized disclosure could reasonably result in serious damage to the national security, the information may be classified as "Secret" and must be properly safeguarded.  Where such unauthorized disclosure could reasonably result in exceptionally grave damage to the national security, the information may be classified as "Top Secret" and must be properly safeguarded.

11.     Sensitive Compartmented Information (SCI) means classified information concerning or derived from intelligence sources, methods, or analytical processes, which is required to be handled within formal access control systems.

12.     Special Intelligence, or "SI," is an SCI control system designed to protect technical and intelligence information derived from the monitoring of foreign communications signals by other than the intended recipients.  The SI control system protects SI-derived information and information relating to SI activities, capabilities, techniques, processes, and procedures.

13.     HUMINT Control System, or "HCS," is an SCI control system designed to protect intelligence information derived from clandestine human sources, commonly referred to as

"human intelligence."  The HCS control system protects human intelligence-derived information and information relating to human intelligence activities, capabilities, techniques, processes, and procedures.

14.     Foreign Intelligence Surveillance Act, or "FISA," is a dissemination control designed to protect intelligence information derived from the collection of information authorized under the Foreign Intelligence Surveillance Act by the Foreign Intelligence Surveillance Court, or "FISC."

15.     Classified information may be marked as "Not Releasable to Foreign Nationals/Governments/US Citizens," abbreviated "NOFORN," to indicate information that may not be released in any form to foreign governments, foreign nationals, foreign organizations, or non-U.S. citizens without permission of the originator.

16.     Classified information may be marked as "Originator Controlled," abbreviated "ORCON."  This marking indicates that dissemination beyond pre-approved U.S. entities requires originator approval.

17.     Classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know."  Among other requirements, in order for a person to obtain a security clearance allowing that person access to classified United States Government information, that person is required to and must agree to properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations.  If a person is not eligible to receive classified information, classified information may not be disclosed to that person.  In order for a foreign government to receive

access to classified information, the originating United States agency must determine that such release is appropriate.

18.     Pursuant to Executive Order 13526, classified information contained on automated information systems, including networks and telecommunications systems, that collect, create, communicate, compute, disseminate, process, or store classified information must be maintained in a manner that: (1) prevents access by unauthorized persons; and (2) ensures the integrity of the information.

19.     32 C.F.R. Parts 2001 and 2003 regulate the handling of classified information. Specifically, 32 C.F.R. § 2001.43, titled "Storage," regulates the physical protection of classified information.  This section prescribes that Secret and Top Secret information "shall be stored in a [General Services Administration]-approved security container, a vault built to Federal Standard (FHD STD) 832, or an open storage area constructed in accordance with § 2001.53."  It also requires periodic inspection of the container and the use of an Intrusion Detection System, among other things.

20.     Under 18 U.S.C. § 1519:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

21.     Under 18 U.S.C. § 2071:

(a)  Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined under this title or imprisoned not more than three years, or both.

(b) Whoever, having the custody of any such record, proceeding, map, book, document, paper, or other thing, willfully and unlawfully conceals, removes, mutilates, obliterates, falsifies, or destroys the same, shall be fined under this title or imprisoned not more than three years, or both; and shall forfeit his office and be disqualified from holding any office under the United States. As used in this subsection, the term "office" does not include the office held by any person as a retired officer of the Armed Forces of the United States.

22.     Under the PRA, 44 U.S.C. § 2201:

(2) The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term—

> (A) includes any documentary materials relating to the political activities of the President or members of the President's staff, but only if such activities relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; but

> (B) does not include any documentary materials that are (i) official records of an agency (as defined in section 552(e) of title 5, United States Code; (ii) personal records; (iii) stocks of publications and stationery; or (iv) extra copies of documents produced only for convenience of reference, when such copies are clearly so identified.

23.     Under 44 U.S.C. § 3301(a), government "records" are defined as:

all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them.

## **PROBABLE CAUSE**

### *NARA Referral*

24.     On February 9, 2022, the Special Agent in Charge of NARA's Office of the

Inspector General sent the NARA Referral via email to DOJ.  The NARA Referral stated that

according to NARA's White House Liaison Division Director, a preliminary review of the

FIFTEEN BOXES indicated that they contained "newspapers, magazines, printed news articles,

photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-

presidential records, and 'a lot of classified records.'  Of most significant concern was that highly

classified records were unfoldered, intermixed with other records, and otherwise unproperly [*sic*]

identified."

      25.     On February 18, 2022, the Archivist of the United States, chief administrator for

NARA, stated in a letter to Congress's Committee on Oversight and Reform Chairwoman The

Honorable Carolyn B. Maloney, "NARA had ongoing communications with the representatives of

former President Trump throughout 2021, which resulted in the transfer of 15 boxes to NARA in

January 2022 . . . .  NARA has identified items marked as classified national security information

within the boxes."  The letter also stated that, "[b]ecause NARA identified classified information

in the boxes, NARA staff has been in communication with the Department of Justice."  The letter

was made publicly available at the following uniform resource locator (URL):

https://www.archives.gov/files/foia/ferriero-response-to-02.09.2022-maloney-

letter.02.18.2022.pdf.  On February 18, 2022, the same day, the Save America Political Action

Committee (PAC) posted the following statement on behalf of FPOTUS: "The National Archives

did not 'find' anything, they were given, upon request, Presidential Records in an ordinary and

routine process to ensure the preservation of my legacy and in accordance with the Presidential

Records Act . . . ."  An image of this statement is below.



- February 18, 2022 -

### Statement by Donald J. Trump, 45th President of the United States of America

The National Archives did not "find" anything, they were given, upon request, Presidential Records in an ordinary and routine process to ensure the preservation of my legacy and in accordance with the Presidential Records Act. If this was anyone but "Trump," there would be no story here. Instead, the Democrats are in search of their next Scam. The Russia, Russia, Russia Hoax turned out to be a Democrat inspired fake story to help Crooked Hillary Clinton. Impeachment Hoax #1, Impeachment Hoax #2, and so much more, has all been a Hoax. The Fake News is making it seem like me, as the President of the United States, was working in a filing room. No, I was busy destroying ISIS, building the greatest economy America had ever seen, brokering Peace deals, making sure Russia didn't attack Ukraine, making sure China didn't take over Taiwan, making sure there was no inflation, creating an energy independent country, rebuilding our military and law enforcement, saving our Second Amendment, protecting our Border, and cutting taxes. Now, Russia is invading Ukraine, our economy is being destroyed, our Border is once again overrun, and the mandate continues. Instead of focusing on America, the media just wants to talk about their plan to "get" Trump. The people won't stand for it any longer!

████████████████████████████████████

26. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

27. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

28. ████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

██████████████████. It was FPOTUS's practice to store accumulated documents in

boxes, and that continues to be his practice. ████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████

29. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

***Boxes Containing Documents Were Transported from the White House to Mar-a-Lago***

30.     According to a CBS Miami article titled "Moving Trucks Spotted At Mar-a-Lago,"

published Monday, January 18, 2021, at least two moving trucks were observed at the PREMISES

on January 18, 2021. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████

31.     ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

32.     ████████████████████████████████████████



33. ██████████████████████████████████

███████████████████████████████████████

██████████████████

34.     Between January 21, 2021, and late August 2021, the FPOTUS BOXES were

stored in at least two different rooms within the PREMISES. ████████████████████

██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

35.   ████████████████████████████████████████

████████████████████████████████   The door to the STORAGE ROOM

was painted gold and had no other markings on it.  The door to the STORAGE ROOM is located

approximately mid-way up the wall and is reachable by several wooden stairs.

36.   In addition to the approximately eighty-five to ninety-five FPOTUS BOXES

located in the STORAGE ROOM, there were also other boxes in the STORAGE ROOM with

merchandise such as challenge coins, garment bags, memorabilia from Mar-a-Lago such as

photograph frames, and other décor items.

37.   ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████

*Provision of the Fifteen Boxes to NARA*

38.   ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

39.     On or about May 6, 2021, NARA made a request for the missing PRA records and continued to make requests until approximately late December 2021 when NARA was informed twelve boxes were found and ready for retrieval at the PREMISES. ████████████████

██████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

██████████████ ████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ Pine Hall is the

[1]████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████.

anteroom to FPOTUS's personal residential suite.

40. ██████████████████████████████████████████████
██████

41. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████

42. ██████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████

43. ████████████████████████████████████
█████████████████████████████████████████████

44. ██████████████████████████████████████████████
█████████████████████████████████████████████

███████████████████████

     45.   ████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

██████████████████████████

     46.   ████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████ The purpose of the photograph was to show FPOTUS the volume of boxes that remained in the STORAGE ROOM.  The STORAGE-PHOTO, which appears below, captures approximately sixty-one of the FPOTUS BOXES located in the STORAGE ROOM:



### *The FIFTEEN BOXES Provided to NARA Contain Classified Information*

47.     From May 16-18, 2022, FBI agents conducted a preliminary review of the FIFTEEN BOXES provided to NARA and identified documents with classification markings in fourteen of the FIFTEEN BOXES.  A preliminary triage of the documents with classification markings revealed the following approximate numbers:  184 unique documents bearing classification markings, including 67 documents marked as CONFIDENTIAL, 92 documents marked as SECRET, and 25 documents marked as TOP SECRET.  Further, the FBI agents observed markings reflecting the following compartments/dissemination controls: HCS, FISA, ORCON, NOFORN, and SI.  Based on my training and experience, I know that documents classified at these levels typically contain NDI.  Several of the documents also contained what appears to be FPOTUS's handwritten notes.

48.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ I believe the contents of the remainder of the FPOTUS BOXES are similar to the contents of the FIFTEEN BOXES.  Further, based upon the presence and number of documents and records bearing classification markings discovered within the FIFTEEN BOXES provided to NARA, there is reason to believe the remaining FPOTUS BOXES, from which the FIFTEEN BOXES were taken, contain classified NDI.

### *Following the Provision of the FIFTEEN BOXES to NARA, Remaining FPOTUS BOXES Were Moved from the STORAGE ROOM to Other Locations at the Premises*

49.     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



50.

***Grand Jury Subpoena, Related Correspondence, and Production of Additional Classified Documents***

51.     DOJ has advised me that, on May 11, 2022, an attorney representing FPOTUS, "FPOTUS COUNSEL 1," agreed to accept service of a grand jury subpoena from a grand jury sitting in the District of Columbia sent to him via email by one of the prosecutors handling this matter for DOJ, "DOJ COUNSEL." The subpoena was directed to the custodian of records for the Office of Donald J. Trump, and it requested the following materials:

> Any and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings, including but not limited to the following: Top Secret, Secret, Confidential, Top Secret/SI-G/NOFORN/ORCON, Top Secret/SI-G/NOFORN, Top Secret/HCS-O/NOFORN/ORCON, Top Secret/HCS-O/NOFORN, Top Secret/HCS-P/NOFORN/ORCON, Top Secret/HCS-P/NOFORN, Top Secret/TK/NOFORN/ORCON, Top Secret/TK/NOFORN, Secret/NOFORN, Confidential/NOFORN, TS, TS/SAP, TS/SI-G/NF/OC, TS/SI-G/NF, TS/HCS-O/NF/OC, TS/HCS-O/NF, TS/HCS-P/NF/OC, TS/HCS-P/NF, TS/HCS-P/SI-G, TS/HCS-P/SI/TK, TS/TK/NF/OC, TS/TK/NF, S/NF, S/FRD, S/NATO, S/SI, C, and C/NF.

18

The return date of the subpoena was May 24, 2022.  DOJ COUNSEL also sent FPOTUS

COUNSEL 1 a letter that permitted alternative compliance with the subpoena by "providing any

responsive documents to the FBI at the place of their location" and by providing from the

custodian a "sworn certification that the documents represent all responsive records."  The letter

further stated that if no responsive documents existed, the custodian should provide a sworn

certification to that effect.

52.     On May 25, 2022, while negotiating for an extension of the subpoena, FPOTUS

COUNSEL 1 sent two letters to DOJ COUNSEL.  In the second such letter, which is attached as

Exhibit 1, FPOTUS COUNSEL 1 asked DOJ to consider a few "principles," which include

FPOTUS COUNSEL 1's claim that a President has absolute authority to declassify documents.  In

this letter, FPOTUS COUNSEL 1 requested, among other things, that "DOJ provide this letter to

any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any

application made in connection with any investigative request concerning this investigation."

53.     I am aware of an article published in *Breitbart* on May 5, 2022, available at

https://www.breitbart.com/politics/2022/05/05/documents-mar-a-lago-marked-classified-were-
already-declassified-kash-patel-says/, which states that Kash Patel, who is described as a former

top FPOTUS administration official, characterized as "misleading" reports in other news

organizations that NARA had found classified materials among records that FPOTUS provided to

NARA from Mar-a-Lago.  Patel alleged that such reports were misleading because FPOTUS had

declassified the materials at issue.  ███████████████████████████

██████████████████████████████████████████████

█████████████████████████████

54.     ███████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

████████████████████

55.     After an extension was granted for compliance with the subpoena, on the evening of June 2, 2022, FPOTUS COUNSEL 1 contacted DOJ COUNSEL and requested that FBI agents meet him the following day to pick up responsive documents.  On June 3, 2022, three FBI agents and DOJ COUNSEL arrived at the PREMISES to accept receipt of the materials.  In addition to FPOTUS COUNSEL 1, another individual, hereinafter "INDIVIDUAL 2," was also present as the custodian of records for FPOTUS's post-presidential office.  The production included a single Redweld envelope, wrapped in tape, containing documents.  FPOTUS COUNSEL 1 relayed that the documents in the Redweld envelope were found during a review of the boxes located in the STORAGE ROOM.  INDIVIDUAL 2 provided a Certification Letter, signed by INDIVIDUAL 2, which stated the following:

> Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: a. A diligent search was conducted of the boxes that were moved from the White House to Florida; b. This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; c. Any and all responsive documents accompany this certification; and d. No copy, written notation, or reproduction of any kind was retained as to any responsive document.

56.     During receipt of the production, FPOTUS COUNSEL 1 stated he was advised all

the records that came from the White House were stored in one location within Mar-a-Lago, the STORAGE ROOM, and the boxes of records in the STORAGE ROOM were "the remaining repository" of records from the White House.  FPOTUS COUNSEL 1 further stated he was not advised there were any records in any private office space or other location in Mar-a-Lago.  The agents and DOJ COUNSEL were permitted to see the STORAGE ROOM and observed that approximately fifty to fifty-five boxes remained in the STORAGE ROOM.  Considering that only FIFTEEN BOXES had been provided to NARA of the approximately eighty-five to ninety-five FPOTUS BOXES that had been located in the STORAGE ROOM, it appears that approximately fifteen to thirty of the FPOTUS BOXES had previously been relocated elsewhere.  The FBI agents also observed that the composition of boxes differed such that fewer Bankers boxes were visible, while more plain cardboard boxes and storage bins were present.  Other items were also present in the STORAGE ROOM, including a coat rack with suit jackets, as well as interior décor items such as wall art and frames.

57. ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

58.     A preliminary review of the documents contained in the Redweld envelope produced pursuant to the grand jury subpoena revealed the following approximate numbers: 38 unique documents bearing classification markings, including 5 documents marked as CONFIDENTIAL, 16 documents marked as SECRET, and 17 documents marked as TOP SECRET.  Further, the FBI agents observed markings reflecting the following caveats/compartments, among others: HCS, SI, and FISA.  Based on my training and experience, I know that documents classified at these levels typically contain NDI.  Multiple documents also

contained what appears to be FPOTUS's handwritten notes.

59.     Notably, although the FIFTEEN BOXES provided to NARA contained approximately 184 unique documents with classification markings, only approximately 38 unique documents with classification markings were produced from the remaining FPOTUS BOXES.

60.     When producing the documents, neither FPOTUS COUNSEL 1 nor INDIVIDUAL 2 asserted that FPOTUS had declassified the documents.[2]  The documents being in a Redweld envelope wrapped in tape appears to be consistent with an effort to handle the documents as if they were still classified.

61.     On June 8, 2022, DOJ COUNSEL sent FPOTUS COUNSEL 1 a letter, which reiterated that the PREMISES are not authorized to store classified information and requested the preservation of the STORAGE ROOM and boxes that had been moved from the White House to the PREMISES.  Specifically, the letter stated in relevant part:

> As I previously indicated to you, Mar-a-Lago does not include a secure location authorized for the storage of classified information.  As such, it appears that since the time classified documents (the ones recently provided and any and all others) were removed from the secure facilities at the White House and moved to Mar-a-Lago on or around January 20, 2021, they have not been handled in an appropriate manner or stored in an appropriate location.  Accordingly, we ask that the room at Mar-a-Lago where the documents had been stored be secured and that all of the boxes that were moved from the White House to Mar-a-Lago (along with any other items in that room) be preserved in that room in their current condition until further notice.

---

[2] 18 U.S.C. § 793(e) does not use the term "classified information," but rather criminalizes the unlawful retention of "information relating to the national defense." The statute does not define "information related to the national defense," but courts have construed it broadly.  *See Gorin v. United States*, 312 U.S. 19, 28 (1941) (holding that the phrase "information relating to the national defense" as used in the Espionage Act is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"). In addition, the information must be "closely held" by the U.S. government.  *See United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000) ("[I]nformation made public by the government as well as information never protected by the government is not national defense information."); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988).  Certain courts have also held that the disclosure of the documents must be potentially damaging to the United States.  *See Morison*, 844 F.2d at 1071-72.

On June 9, 2022, FPOTUS COUNSEL 1 sent an email to DOJ COUNSEL, stating, "I write to acknowledge receipt of this letter."

### *Surveillance Camera Footage Shows Boxes Being Removed from the Storage Room Area Prior to FPOTUS Counsel 1's Review in Connection With the Subpoena*

62.    DOJ COUNSEL has advised me that on or about June 22, 2022, counsel for the Trump Organization, a group of business entities associated with FPOTUS, confirmed that the Trump Organization maintains security cameras in the vicinity of the STORAGE ROOM and that on June 24, 2022, counsel for the Trump Organization agreed to accept service of a grand jury subpoena for footage from those cameras.

63.    The subpoena was served on counsel on June 24, 2022, directed to the Custodian of Records for the Trump Organization, and sought:

> Any and all surveillance records, videos, images, photographs, and/or CCTV from internal cameras located on ground floor (basement) ███████████████ ███ on the Mar-a-Lago property located at 1100 S Ocean Blvd., Palm Beach, FL 33480 from the time period of January 10, 2022 to present.

64.    On July 6, 2022, in response to this subpoena, representatives of the Trump Organization provided a hard drive to FBI agents. ████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████ Upon review of the hard drive, the FBI determined that the drive contained video footage from four cameras in the basement hallway of the PREMISES in which the door to the STORAGE ROOM is located. The footage on the drive begins on April 23, 2022, and ends on June 24, 2022.  The recording feature of the cameras appears to be motion activated, so that footage is only captured when motion is detected within each camera's field of view.

65.     One camera in particular, identified on the hard drive as "South Tunnel Liquor," provides a view of entry and exit into a room (hereafter ANTEROOM) that leads to the STORAGE ROOM.  The doorway to the ANTEROOM itself is not visible in the camera view, as a refrigerator is directly between the camera and doorway, but the footage from this camera nonetheless establishes entry and exit to the ANTEROOM because it is apparent when persons within the camera's field of view turn directly behind the refrigerator and then disappear from view.  The ANTEROOM, in addition to its entrance from the South Tunnel, has approximately four doors leading off it, one of which is the gold-painted door that leads to the STORAGE ROOM.  The ANTEROOM provides the only entrance to the STORAGE ROOM; however, other offices can also be entered from the ANTEROOM, so it might be possible for persons to enter the STORAGE ROOM from those other offices without being visible in the surveillance camera footage.

66.     By reviewing the camera footage provided by the Trump Organization in response to the subpoena, the FBI has determined the following:

On May 24, 2022, WITNESS 5 is observed exiting the ANTEROOM doorway with three boxes.

On May 30, 2022, four days after WITNESS 5's interview with the FBI during which the location of boxes was a significant subject of questioning, WITNESS 5 is observed exiting the ANTEROOM doorway with approximately fifty Bankers boxes, consistent with the description of the FPOTUS BOXES.  FBI did not observe this quantity of boxes being returned to the STORAGE ROOM through the ANTEROOM entrance in its review of the footage.

The next day, on June 1, 2022, WITNESS 5 is observed carrying eleven brown cardboard boxes out the ANTEROOM entrance.  One box did not have a lid on it and appeared to contain papers.

The day after that, on June 2, 2022, WITNESS 5 is observed moving twenty-five to thirty boxes, some of which were brown cardboard boxes and others of which were Bankers boxes consistent with the description of the FPOTUS BOXES, into the entrance of the

ANTEROOM.  Approximately three and a half hours later, WITNESS 5 is observed escorting FPOTUS COUNSEL 1 in through the entrance of the ANTEROOM, and FPOTUS COUNSEL 1 is not observed leaving until approximately two and a half hours later.

On June 3, 2022, FPOTUS COUNSEL 1 is escorted through the ANTEROOM entrance by an unidentified individual wearing a jacket with "USSS POLICE" printed on the back.  The unidentified individual and FPOTUS COUNSEL 1 exit the ANTEROOM entrance moments later.  FPOTUS COUNSEL 1 appeared to be carrying a Redweld envelope after exiting the ANTEROOM.

67.     As described above, FPOTUS COUNSEL 1 contacted DOJ COUNSEL on June 2, 2022, asking FBI agents to meet FPOTUS COUNSEL 1 the following day.  As also described above, on June 3, 2022, FPOTUS COUNSEL 1 in response to a grand jury subpoena provided to FBI agents and DOJ COUNSEL a Redweld envelope containing documents bearing classification markings.

68.     █████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

69.     ██████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████

***There is Probable Cause to Believe That Documents Containing Classified NDI and Presidential Records Remain at the Premises***

70.     As explained above, the FPOTUS BOXES contained numerous documents with classification markings, both in the FIFTEEN BOXES and in the remaining FPOTUS BOXES. As also explained above, the classified documents provided to the government in a Redweld envelope pursuant to the subpoena were represented to have been stored in boxes located in the STORAGE ROOM, and based on FPOTUS COUNSEL 1's statements relayed in paragraph 55-56 above, I believe it is very likely that FPOTUS COUNSEL 1 did not search for classified information in other locations at the PREMISES.  The investigation has established, however, that classified information was possessed in other areas of the PREMISES and that other FPOTUS BOXES, which are likely to contain similar contents to the FIFTEEN BOXES, were moved from the STORAGE ROOM to other locations in the PREMISES, including FPOTUS's residential suite and Pine Hall, between the time that the FIFTEEN BOXES were provided to NARA and when FPOTUS COUNSEL 1 conducted his review for classified information of the remaining FPOTUS BOXES in the STORAGE ROOM.

71.     ████████████████████████████████████████

████████████████████████████████████████████

72. ██████████████████████████████████

73. ██████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

74.   ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████  As of June

29, 2022, a padlock was installed on the STORAGE ROOM door.

75.   █████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

76.   █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████

[redacted]

77.     Based upon this investigation, I believe that the STORAGE ROOM, FPOTUS's residential suite, Pine Hall, the "45 Office," and other spaces within the PREMISES are not currently authorized locations for the storage of classified information or NDI.  Similarly, based upon this investigation, I do not believe that any spaces within the PREMISES have been authorized for the storage of classified information at least since the end of FPOTUS's Presidential Administration on January 20, 2021.

78.     As described above, evidence of the SUBJECT OFFENSES has been stored in multiple locations at the PREMISES.  In addition, as described in paragraph 66 among other paragraphs, the video footage reflects that evidence has been moved recently: WITNESS 5 removed approximately 64 boxes from the STORAGE ROOM area between May 24 and June 1, 2022, but only returned 25-30 boxes to the STORAGE ROOM area on June 2, 2022.  It cannot be seen on the video footage where the boxes were moved when they were taken from the STORAGE ROOM area, and accordingly, the current location of the boxes that were removed from the STORAGE ROOM area but not returned to it is unknown.  [redacted]

[redacted]

Accordingly, this affidavit seeks authorization to search the "45 Office" and all storage rooms and

any other rooms or locations where boxes or records may be stored within the PREMISES, as further described in Attachment A.  The PREMISES is currently closed to club members for the summer; however, as specified in Attachment A, if at the time of the search, there are areas of the PREMISES being occupied, rented, or used by third parties, and not otherwise used or available to be used by FPOTUS and his staff, the search would not include such areas.

## CONCLUSION

79.     Based on the foregoing facts and circumstances, I submit that probable cause exists to believe that evidence, contraband, fruits of crime, or other items illegally possessed in violation 18 U.S.C. §§ 793(e), 2071, or 1519 will be found at the PREMISES.  Further, I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

80.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and the FBI has not yet identified all potential criminal confederates nor located all evidence related to its investigation.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by allowing criminal parties an opportunity to flee, destroy evidence (stored electronically and otherwise), change patterns of behavior, and notify criminal confederates.

## SEARCH PROCEDURES FOR HANDLING POTENTIAL ATTORNEY-CLIENT PRIVILEGED INFORMATION

The following procedures will be followed at the time of the search in order to protect against disclosures of attorney-client privileged material:

81.     These procedures will be executed by: (a) law enforcement personnel conducting this investigation (the "Case Team"); and (b) law enforcement personnel not participating in the investigation of the matter, who will search the "45 Office" and be available to assist in the event that a procedure involving potentially attorney-client privileged information is required (the "Privilege Review Team").

82.     The Case Team will be responsible for searching the **TARGET PREMISES**. However, the Privilege Review Team will search the "45 Office" and conduct a review of the seized materials from the "45 Office" to identify and segregate documents or data containing potentially attorney-client privileged information.

83.     If the Privilege Review Team determines the documents or data are not potentially attorney-client privileged, they will be provided to the law-enforcement personnel assigned to the investigation.  If at any point the law-enforcement personnel assigned to the investigation subsequently identify any data or documents that they consider may be potentially attorney-client privileged, they will cease the review of such identified data or documents and refer the materials to the Privilege Review Team for further review by the Privilege Review Team.

84.     If the Privilege Review Team determines that documents are potentially attorney-client privileged or merit further consideration in that regard, a Privilege Review Team attorney may do any of the following: (a) apply *ex parte* to the court for a determination whether or not the documents contain attorney-client privileged material; (b) defer seeking court intervention and

31

continue to keep the documents inaccessible to law-enforcement personnel assigned to the investigation; or (c) disclose the documents to the potential privilege holder, request the privilege holder to state whether the potential privilege holder asserts attorney-client privilege as to any documents, including requesting a particularized privilege log, and seek a ruling from the court regarding any attorney-client privilege claims as to which the Privilege Review Team and the privilege-holder cannot reach agreement.

Respectfully submitted,



Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me by
telephone (WhatsApp) or other reliable electronic
means this ___5___ day of August, 2022:

_____

HON. BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1



**SILVERMAN THOMPSON**

Silverman Thompson Slutkin White

**ATTORNEYS AT LAW**

*A Limited Liability Company*
400 East Pratt Street – Suite 900
Baltimore, Maryland 21202
Telephone 410.385.2225
Facsimile  410.547.2432
**silvermanthompson.com**

*Baltimore | Towson | New York | Washington, DC*

Writer's Direct Contact:
Evan Corcoran
410-385-2225
ecorcoran@silvermanthompson.com

May 25, 2022

*Via Electronic Mail*

Jay I. Bratt, Esquire
Chief
Counterintelligence & Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania, Avenue, N.W.
Washington, D.C. 20530

Re:     Presidential Records Investigation

Dear Jay:

I write on behalf of President Donald J. Trump regarding the above-referenced matter.

Public trust in the government is low. At such times, adherence to the rules and long-standing policies is essential. President Donald J. Trump is a leader of the Republican Party. The Department of Justice (DOJ), as part of the Executive Branch, is under the control of a President from the opposite party. It is critical, given that dynamic, that every effort is made to ensure that actions by DOJ that may touch upon the former President, or his close associates, do not involve politics.

There have been public reports about an investigation by DOJ into Presidential Records purportedly marked as classified among materials that were once in the White House and unknowingly included among the boxes brought to Mar-a-Lago by the movers. It is important to emphasize that when a request was made for the documents by the National Archives and Records Administration (NARA), President Trump readily and voluntarily agreed to their transfer to NARA. The communications regarding the transfer of boxes to NARA were friendly, open, and straightforward. President Trump voluntarily ordered that the boxes be provided to NARA. No legal objection was asserted about the transfer. No concerns were raised about the contents of the boxes. It was a voluntary and open process.

Unfortunately, the good faith demonstrated by President Trump was not matched once the boxes arrived at NARA. Leaks followed. And, once DOJ got involved, the leaks continued. Leaks about any investigation are concerning. Leaks about an investigation that involve the residence of a former President who is still active on the national political scene are particularly troubling.

Jay I. Bratt
May 25, 2022
Page **2** of **3**

It is important to note a few bedrock principles:

### (1)  A President Has Absolute Authority To Declassify Documents.

Under the U.S. Constitution, the President is vested with the highest level of authority when it comes to the classification and declassification of documents. *See* U.S. Const., Art. II, § 2 ("The President [is] Commander in Chief of the Army and Navy of the United States[.]"). His constitutionally-based authority regarding the classification and declassification of documents is unfettered. *See Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[The President's] authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant.").

### (2)  Presidential Actions Involving Classified Documents Are Not Subject To Criminal Sanction.

Any attempt to impose criminal liability on a President or former President that involves his actions with respect to documents marked classified would implicate grave constitutional separation-of-powers issues. Beyond that, the primary criminal statute that governs the unauthorized removal and retention of classified documents or material *does not apply* to the President. That statute provides, in pertinent part, as follows:

> Whoever, being an officer, employee, contractor, or consultant of the United States, and, by virtue of his office, employment, position, or contract, becomes possessed of documents or materials containing classified information of the United States, knowingly removes such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location shall be fined under this title or imprisoned for not more than five years, or both.

18 U.S.C. § 1924(a). An element of this offense, which the government must prove beyond a reasonable doubt, is that the accused is "an officer, employee, contractor, or consultant of the United States." The President is none of these. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 497–98 (2010) (citing U.S. Const., Art. II, § 2, cl. 2) ("The people do not vote for the 'Officers of the United States.'"); *see also Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 518–19 (D.D.C. 1986), *aff'd*, 836 F.2d 561 (D.C. Cir. 1987) ("[a]n officer of the United States can only be appointed by the President, by and with the advice and consent of the Senate, or by a court of law, or the head of a department. A person who does not derive his position from one of these sources is not an officer of the United States in the sense of the Constitution."). Thus, the statute does not apply to acts by a President.

Jay I. Bratt
May 25, 2022
Page **3** of **3**


**(3) DOJ Must Be Insulated From Political Influence.**

According to the Inspector General of DOJ, one of the top challenges facing the Department is the public perception that DOJ is influenced by politics. The report found that "[o]ne important strategy that can build public trust in the Department is to ensure adherence to policies and procedures designed to protect DOJ from accusations of political influence or partial application of the law." *See* https://oig.justice.gov/reports/top-management-and-performance-challenges-facing-department-justice-2021 (last visited May 25, 2022). We request that DOJ adhere to long-standing policies and procedures regarding communications between DOJ and the White House regarding pending investigative matters which are designed to prevent political influence in DOJ decision-making.

**(4) DOJ Must Be Candid With Judges And Present Exculpatory Evidence.**

Long-standing DOJ policy requires that DOJ attorneys be candid in representations made to judges. Pursuant to those policies, we request that DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation.

The official policy of DOJ further requires that prosecutors present exculpatory evidence to a grand jury. Pursuant to that policy, we request that DOJ provide this letter to any grand jury considering evidence in connection with this matter, or any grand jury asked to issue a subpoena for testimony or documents in connection with this matter.

Thank you for your attention to this request.

With best regards,

_____
M. Evan Corcoran


cc:    Matthew G. Olsen
       Assistant Attorney General
       National Security Division
       *Via Electronic Mail*

**ATTACHMENT A**

*Property to be searched*

The premises to be searched, 1100 S Ocean Blvd, Palm Beach, FL 33480, is further described as a resort, club, and residence located near the intersection of Southern Blvd and S Ocean Blvd.  It is described as a mansion with approximately 58 bedrooms, 33 bathrooms, on a 17-acre estate.  The locations to be searched include the "45 Office," all storage rooms, and all other rooms or areas within the premises used or available to be used by FPOTUS and his staff and in which boxes or documents could be stored, including all structures or buildings on the estate.  It does not include areas currently (i.e., at the time of the search) being occupied, rented, or used by third parties (such as Mar-a-Largo Members) and not otherwise used or available to be used by FPOTUS and his staff, such as private guest suites.

1

**ATTACHMENT B**

*Property to be seized*

All physical documents and records constituting evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793, 2071, or 1519, including the following:

a. Any physical documents with classification markings, along with any containers/boxes (including any other contents) in which such documents are located, as well as any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes;

b. Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

c. Any government and/or Presidential Records created between January 20, 2017, and January 20, 2021; or

d. Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential Records, or of any documents with classification markings.

2