# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

## CASE NO. 23-80101-CR-CANNON(s)

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA,**

      Defendants.

_____/

## GOVERNMENT'S OPPOSITION TO WALTINE NAUTA'S MOTION TO DISMISS THE INDICTMENT BASED ON SELECTIVE AND VINDICTIVE PROSECUTION

**TABLE OF CONTENTS**

BACKGROUND ....................................................................................................................... 1

ARGUMENT .......................................................................................................................... 5

I.     Applicable Law ............................................................................................................ 6

II.    Nauta Falls Far Short of Making a Showing of Selective or Vindictive Prosecution......... 7

    A.    Nauta Fails to Identify a Similarly Situated Comparator as Required by the First Prong of the Selective-Prosecution Standard ...................................... 7

    B.    Nauta Fails to Show Discriminatory Purpose or Actual Vindictiveness...................... 9

CONCLUSION ....................................................................................................................... 13

Defendant Waltine Nauta seeks dismissal of the indictment or discovery based on claims of selective and vindictive prosecution.  *See* Nauta's Mot. to Dismiss for Selective and Vindictive Pros. ("Mot.").[1]  His claim of selective prosecution is grounded in comparison to two individuals who, like Nauta, were employed by codefendant Donald J. Trump but whose conduct was not remotely similar to his own.  He therefore fails to provide apt comparators or any evidence that he was selected for prosecution over those other individuals for improper reasons.  And his claim of vindictive prosecution amounts to the following: he did not accept the routine invitation in a target letter to appear before the grand jury, and thus his indictment must have been punishment for that decision.  This novel and unsupported claim would render any recipient of a target letter immune from charges by the simple expedient of declining the offer.  Nauta's arguments are without merit and should be denied.

## BACKGROUND

As alleged in the Superseding Indictment, during his presidency, Trump used boxes to accumulate and store records, accumulating dozens of these boxes by the end of his presidency. ECF No. 85 ¶¶ 1-3.  At the end of his presidency in January 2021, scores of these boxes were removed from the White House and transported to Trump's residence at Mar-a-Lago, where they were later placed in a storage room.  *Id.* ¶ 4.  When the National Archives and Records Administration ("NARA") requested records from Trump's administration, Trump wanted to review his boxes before providing them to NARA, and between November 2021 and January 2022, employees (including Nauta) brought boxes to his personal residence in Mar-a-Lago for him to review.  *Id.* ¶¶ 39-46.  On January 17, 2022, Nauta and another Trump employee gathered 15 boxes from Trump's residence and handed them over to NARA.  *Id.* ¶ 47.  After NARA found highly

---

[1] Nauta's motion has not yet been docketed publicly or received an ECF number.

1

classified documents in the boxes and informed the Department of Justice, a grand jury issued a subpoena for all documents with classification markings in Trump's possession. *Id.* ¶¶ 49-53. Trump met with his lawyers to discuss the subpoena on May 23, 2023, and a lawyer returned to Mar-a-Lago on June 2, 2023, to search the boxes in the storage for responsive documents. *Id.* ¶¶ 55-65. On June 3, 2023, the lawyer provided a folder of documents with classification markings to FBI agents, along with a certification indicating that the folder contained all responsive documents. *Id.* ¶¶ 65-72. After a grand jury issued a subpoena for security footage from Mar-a-Lago, and that footage showed Nauta moving boxes out of the storage room after the grand jury issued the subpoena but before Trump's lawyer reviewed the boxes in the room for responsive documents, FBI agents obtained and executed a warrant to search Mar-a-Lago, finding more than 100 additional documents with classification markings. *Id.* ¶¶ 59, 88-90.

The Superseding Indictment alleges that Nauta participated in these events at several critical moments. Nauta served as a valet for Trump during his presidency and then as Trump's "body man" post-presidency; he reported to Trump, worked closely with Trump, and traveled with Trump. *Id.* ¶ 9. Nauta helped Trump pack his boxes for his move out of the White House at the end of his presidency in January 2021. *Id.* ¶ 25. Nauta and other Trump employees moved the boxes from a ballroom in Mar-a-Lago to a business center in the main building before the boxes were later moved to the storage room. *Id.* ¶¶ 26-31. Nauta brought boxes to Trump's residence for Trump to review and then took the 15 boxes from Trump's residence to turn them over to NARA when Trump was ready there. *Id.* ¶¶ 39-47.[2] The day before Trump's meeting with lawyers on May 23, 2022, to discuss the grand jury subpoena for documents with classification markings,

---

[2] During this process, on December 7, 2021, Nauta found several of Trump's boxes fallen and their contents spilled on the floor of the storage room, and he sent a co-worker photographs, including a photograph showing a visibly marked classified document. ECF No. 85 ¶ 32.

Nauta retrieved one box from the storage room. *Id.* ¶¶ 54-56. After the meeting, between May 24, 2022, and June 1, 2022, Nauta removed approximately 64 boxes from the storage room. *Id.* ¶ 59. Shortly before Trump's lawyer arrived at Mar-a-Lago to review boxes in the storage room for documents responsive to the subpoena, Nauta and codefendant Carlos De Oliveira moved approximately 30 boxes into the storage room. *Id.* ¶¶ 62-63. When the lawyer arrived, Nauta escorted the lawyer to the storage room to review the boxes. *Id.* ¶¶ 64-65. After Trump learned about the grand jury subpoena for security footage from Mar-a-Lago, which would show the box movement, Trump asked to see Nauta, and Nauta then abruptly changed his travel plans and flew to Mar-a-Lago. *Id.* ¶¶ 74-81. While there, he coordinated with codefendant Carlos De Oliveira, who approached the Director of Information Technology at Mar-a-Lago and told him that "the boss" wanted the server deleted. *Id.* ¶¶ 80-87.

Nauta twice provided statements to investigators during the course of these events, and he was less than candid on both occasions. First, he submitted to a voluntary, recorded interview with FBI agents on May 26, 2023, with counsel present. *Id.* ¶¶ 48, 110-12.[3] During that interview, Nauta falsely told the agents that he was not aware that boxes had been brought to Trump at his residence before the 15 boxes were turned over to NARA; that he did not know how the boxes he took from Trump's residence to turn over to NARA had gotten to Trump's residence; and that he did not know where the boxes had been stored before they were in Trump's residence and whether they had been in a secure or locked location. *Id.* ¶ 48. Second, Nauta testified before the grand

---

[3] Nauta claims that he "cooperated" with the investigation because, in addition to the interview and grand-jury appearance described above, he "hand[ed] over two iPhones to federal authorities in response to" warrants. Mot. at 9. But Nauta obfuscated and lied to the FBI agents and the grand jury, and Nauta cannot claim that he cooperated with the investigation merely because he did not resist when agents with validly issued search warrants arrived to seize his phones.

jury on June 21, 2022.  Ex. 1, Mar-a-Lago Search Warrant Aff. ¶ 31.  Although he was asked whether he had removed anything from the storage room, he did not inform the grand jury that he had removed approximately 60 boxes between May 24 and June 1, 2022.  *Id.* ¶ 69.  As a result, the Government did not discover Nauta's surreptitious box movement until later, when it obtained security camera footage showing his conduct.  ECF No. 85 ¶¶ 74-77, 88.

On May 24, 2023, pursuant to United States Justice Manual § 9-11.151, the Government sent a letter to Nauta's counsel informing him that Nauta was a target of a federal criminal investigation into violations of federal criminal laws, including 18 U.S.C. § 1001, § 1512, and § 1519, and that Nauta was "a putative defendant."  Def. Ex. 7.  The letter informed Nauta's counsel that pursuant to United States Justice Manual § 9-11.153, the letter "constitute[d] notice of your client's status as a target and is intended to afford your client an opportunity to testify before the grand jury."  *Id.*  The letter further stated, as relevant here, that "[y]our client is not required to accept this invitation to testify; the decision whether to do so is voluntary," but should he choose to appear before the grand jury, "[h]e may refuse to answer any question if a truthful answer to the question would tend to incriminate him."  *Id.*

Nauta did not accept the offer to appear before the grand jury, and on June 8, 2023, a grand jury returned an Indictment charging him with violating and conspiring to violate 18 U.S.C. § 1512(b)(2)(A) and 18 U.S.C. § 1512(c)(1), and with violating 18 U.S.C. § 1519, § 1001(a)(1), and § 1001(a)(2).  On July 27, 2023, a grand jury returned a Superseding Indictment containing the same charges against Nauta as in the initial Indictment, as well as a charge of violating 18 U.S.C. § 1512(b)(2)(B) and an additional charge of violating 18 U.S.C. § 1512(c)(1).

## ARGUMENT

Nauta argues that the Government selectively and vindictively prosecuted him by bringing the indictment against him to "retaliate[] against the exercise of his Fifth Amendment rights." Mot. at 9 (capitalization altered). Nauta's arguments are legally and factually flawed. Nauta's selective-prosecution claim fails for the threshold reason that he has not identified any similarly situated individuals who were not prosecuted; the two comparators he mentions are far different from him. Nor does Nauta demonstrate discriminatory purpose or vindictive animus. Nauta apparently contends that his decision not to accept the offer in the target letter to appear before the grand jury amounted to an exercise of his Fifth Amendment right against self-incrimination. And he appears to assert that the Government brought charges against him to punish him for not accepting the offer in the target letter.[4] But Nauta's failure to accept the letter's offer to appear before the grand jury was not an invocation of his right against self-incrimination, and the charges against Nauta therefore could not have been a punishment for exercising those rights. And even if the failure to accept the letter's offer to appear before the grand jury were treated as an assertion of his right against self-incrimination, Nauta provides nothing but speculation and conjecture to support the contention that the charges were brought to punish him for asserting that right. Nauta is not entitled to discovery, let alone dismissal of the indictment. The motion should be denied.

---

[4] Nauta's motion states: "While Mr. Nauta declined the prosecution's request to testify before an additional federal grand jury [cite], and such construction that his declination was anything other than cooperative would be wholly inaccurate." Mot. at 9 (no alterations; brackets in original). The motion further states: "Accordingly, Mr. Nauta's declination to testify before a federal grand jury should only be lawful assertion of his Fifth Amendment rights to which he is guaranteed by right under the U.S. Constitution." Mot. at 10.

## I.    Applicable Law[5]

The decision to bring charges in a case is subject to a "presumption of regularity," and, with rare exceptions, defendants and courts are precluded from "[e]xamining the basis of a prosecution" or "subjecting the prosecutor's motives and decisionmaking to outside inquiry." *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996); *see Wayte v. United States*, 470 U.S. 598, 607 (1985).  Those rare exceptions include cases violating the constitutional prohibitions on selective and vindictive prosecution.  Selective prosecution occurs when the decision to prosecute is "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (quotation marks omitted).  And vindictive prosecution occurs when a "charging decision" or other prosecutorial action is "motivated by a desire to punish [the defendant] for doing something that the law plainly allowed him to do."  *United States v. Goodwin*, 457 U.S. 368, 384 (1982).

To prove a claim of selective or vindictive prosecution, a defendant must establish each of the constituent elements by "clear and convincing evidence."  *United States v. Smith*, 231 F.3d 800, 808 (11th Cir. 2000) (selective prosecution); *see United States v. Simbaqueba Bonilla*, No. 07-cr-20897, 2010 WL 11627259, at *4-5 (S.D. Fla. May 20, 2010) (vindictive prosecution).  A claim of selective prosecution requires a defendant to "demonstrate [1] that the federal prosecutorial policy had a discriminatory effect and [2] that it was motivated by a discriminatory purpose."  *Smith*, 231 F.3d at 808 (quotation marks omitted).  A vindictive prosecution claim based on a theory of actual vindictiveness requires the defendant to demonstrate "that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus."  *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001); *see United States v. Barner*,

---

[5] The applicable law has been set forth at greater length at ECF No. 337 at 3-6.

6

441 F.3d 1310, 1322 (11th Cir. 2006) (citing *Wilson* and stating that the "elements of prosecutorial vindictiveness are animus plus causation").

To obtain discovery in support of such claims, a defendant must meet a "correspondingly rigorous standard," *Armstrong*, 517 U.S. at 468, that is "only slightly lower than for proving the claim itself," *United States v. Hare*, 820 F.3d 93, 99 (4th Cir. 2006) (quotation marks omitted); *see United States v. Bass*, 536 U.S. 862 (2002) (per curiam). That standard requires the defendant to make "a credible showing" to support his claim, by providing "some evidence tending to show the existence of the essential elements of the defense." *Armstrong*, 517 U.S. at 468, 470 (quotation marks omitted); *see United States v. Cannon*, 987 F.3d 924, 937 (11th Cir. 2021).

## II. Nauta Falls Far Short of Making a Showing of Selective or Vindictive Prosecution

Nauta fails to satisfy any of the requirements for claims of selective or vindictive prosecution. He is entitled to neither dismissal nor discovery.

### A. Nauta Fails to Identify a Similarly Situated Comparator as Required by the First Prong of the Selective-Prosecution Standard

The first prong of the selective-prosecution standard requires a showing that "similarly situated individuals were not prosecuted," which requires the defendant to identify a "comparator [who] committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *Smith*, 231 F.3d at 809-10. The comparator must "be nearly identical" to the defendant. *United States v. Brantley*, 803 F.3d 1265, 1272 (11th Cir. 2015).

Nauta proposes (Mot. at 12-13) two individuals as comparators, based on their involvement in a single incident. Specifically, in December 2022, some Trump employees, including

███ Per. 10 ███, ████████████████████████████████████, decided to organize and clean their workspace at Mar-a-Lago.  Ex. 2 at USA-00817569, USA-00817572, USA-00817588-91; Ex. 3 at USA-00804285-86, USA-00804288.  ███ Per. 10 ███ decided that a box that had been stored under ██ P10 ██ desk could go to off-site storage.  Ex. 2 at USA-00817559-61, USA-00817568-69, USA-00817572, USA-00817588-89, USA-00817592-93; Ex. 3 at USA-00804285, USA-00804288.  The box contained Trump's daily schedule from his presidency, and ███ Per. 10 ███ had scanned the contents of the box to ██ P10 ██ computer over a year earlier.  Ex. 2 at USA-00817528-31, USA-00817552-53.  The box was put in the trunk of a car belonging to ████ Per. 11 ████—with the expectation they it would be taken to off-site storage the next day.  Ex. 2 at USA-00817589-90; Ex. 3 at USA-00804284-85.  ███ Per. 10 ███ later decided it would be prudent to wait to send the box to storage because ██ P10 ██ knew Trump's lawyers were in the process of conducting a search related to "this . . . investigation."  Ex. 2 at USA-00817591; *see* Ex. 2 at USA-00817588, USA-00817593-95; Ex. 3 at USA-00804287-88, USA-00804290.  As a result, the next day, they brought the box back to the office from the trunk of the car, where it had remained overnight.  Ex. 2 at USA-00817589-90.  Trump's lawyers subsequently searched the office and found documents with classification markings in the box, which they produced to the Government.  Ex. 2 at USA-00817561-66.

Nauta's conduct is not remotely comparable to the conduct of either ███ Per. 10 ███ or ███ Per. 11 ███.  Nauta moved scores of boxes *out* of the storage room  before Trump's attorney conducted a search for responsive documents in the storage room, in order to keep the boxes away from the attorney so he did not search them.  In the incident Nauta relies on as a basis for comparison, in contrast, ███ Per. 10 ███ and ███ Per. 11 ███ moved a single box back *into* the office— with no involvement from Trump—to ensure that Trump's attorneys would have access to the box.

In other words, whereas Nauta's conduct was intended to obstruct an attorney's review, the routine administrative conduct of ▮Per. 10▮ and ▮Per. 11▮ was intended to facilitate review. Moreover, Nauta misled and lied to investigators—in a voluntary interview and in the grand jury— and tried to get the Director of Information Technology at Mar-a-Lago to delete security footage that would show Nauta moving boxes out of the storage room.  By contrast, Nauta does not even argue that ▮Per. 10▮ or ▮Per. 11▮ engaged in any obstructive conduct.

Nauta has therefore failed to identify any person who qualifies as a similarly situated comparator.  Nor does he identify any improper purpose for which the Government might have selected him for prosecution rather than the other two Trump employees that he offers as comparators.  His request for discovery or dismissal on the basis of selective prosecution can and should be denied on this basis alone.  *See Cannon*, 987 F.3d at 939.

## B.    Nauta Fails to Show Discriminatory Purpose or Actual Vindictiveness

Nauta appears to contend (Mot. at 9-11) that the same evidence—a series of innocuous and entirely appropriate events preceding his indictment—demonstrates both animus (for purposes of establishing vindictive prosecution) and discriminatory purpose (the second prong of a selective-prosecution claim).  That evidence falls far short of showing either "animus plus causation," *Barner*, 441 F.3d at 1322 (vindictive-prosecution standard), or that the prosecutorial "decisionmaker" was "motivated by a discriminatory purpose," *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (quotation marks omitted) (second prong of a selective-prosecution claim).

Nauta argues (Mot. at 9-11) that the following factual assertions support his claims.  On May 8, 2023, an attorney for the Government reached out to speak with counsel for Nauta, and they arranged to meet over a cup of coffee.  Def. Exs. 4, 5.  They met the next day as planned, and

according to Nauta, they spoke about a potential violation of 18 U.S.C. § 1001, and the prosecutor said "that the prosecution would not accept anything less than Mr. Nauta's full cooperation" and declined an offer "to proffer by Mr. Woodward." Mot. at 10. Subsequently, on May 22, 2023, the prosecutor informed Nauta's counsel that, consistent with their prior conversation, he (Nauta's counsel) would soon be receiving a target letter. *See* Mot. at 5 (quoting email). As forecasted, the Government sent Nauta's counsel a target letter on May 24, 2023. Def. Ex. 7.[6] Among other things, the letter stated that Nauta was the target of a criminal investigation focused on 18 U.S.C. § 1001, § 1512, and § 1519. *Id.* Nauta did not accept the offer to appear before the grand jury, and the grand jury returned an indictment on June 8, 2023.

In Nauta's view (Mot. at 9-10), these events establish animus and discriminatory purpose because (1) his decision not to appear before the grand jury after receiving the target letter was akin to invoking his Fifth Amendment right against self-incrimination; and (2) the Government brought charges against him to punish him for invoking his Fifth Amendment rights. This argument fails both factually and legally. Nauta's failure to accept the target letter's offer to appear before the grand jury was not an assertion of his right against self-incrimination. "It has long been settled that the privilege generally is not self-executing and that a witness who desires its protection must claim it." *Salinas v. Texas*, 570 U.S. 178, 181 (2013) (quotation marks omitted). Moreover, the right against self-incrimination "may be asserted only to resist *compelled* explicit or implicit disclosures of incriminating information." *Doe v. United States*, 487 U.S. 201, 212 (1988); *see Jenkins v. Anderson*, 447 U.S. 231, 243-44 (1980) (Stevens, J., concurring) ("When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his

---

[6] The letter was sent by email at approximately 12:45 a.m. on May 24, 2023, and is dated May 23, 2023. *See* Def. Ex. 7.

voluntary decision to do one or the other should raise any issue under the Fifth Amendment."). Nauta was not compelled to appear before the grand jury, let alone testify. The target letter made clear that Nauta was "not required to accept this invitation to testify" and "the decision whether to do so is voluntary," and that if he should "choose to appear before the grand jury," he could "refuse to answer any question if a truthful answer to the question would tend to incriminate him." Def. Ex. 7. Even if Nauta's failure to accept the target letter's offer to appear before the grand jury could be construed as an invocation of his right against self-incrimination, there is no basis to conclude that the Government brought charges to punish him for exercising that right. The target letter itself informed Nauta that the Government had "substantial evidence linking [Nauta] to the commission" of the listed crimes, and that he was "a putative defendant." *Id.* A finding of vindictive prosecution in these routine circumstances would largely foreclose the use of target letters. But such letters are "encouraged," Justice Manual § 9-11.153, and intended for the benefit of the defendant. Nauta's being charged was not to punish him for exercising his Fifth Amendment right against self-crimination or any other constitutional right, and he provides nothing but speculation and innuendo to suggest otherwise.

Nauta's claim also fails insofar he suggests he was charged because he declined to cooperate. As the Supreme Court has explained, although the government may not retaliate against a defendant for exercising legal rights, "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (no vindictive prosecution when the prosecutor, after the defendant refused to plead guilty to the original charges carrying a sentence of two to ten years of imprisonment, indicted the defendant under a recidivist statute carrying a mandatory life term). Accordingly, "[w]hen the party refuses to cooperate, prosecution,

based upon probable cause to believe the defendant committed the crime charged," is not vindictive. *United States v. Boss*, 652 F.2d 36, 38 (10th Cir. 1981); *see United States v. Davis*, 854 F.3d 1276, 1291 (11th Cir. 2017) ("[The defendant] cites no authority suggesting that the government cannot use the threat of prosecution to encourage cooperation, and courts that have considered this issue have concluded otherwise."); *United States v. Oliver*, 787 F.2d 124, 125-26 (3d Cir. 1986) (no prosecutorial vindictiveness where federal charges were brought because defendant failed to cooperate satisfactorily with local authorities).

Finally, Nauta's suggestion (Mot. at 8-9) that a presumption of vindictiveness could possibly apply here must be rejected. A defendant may sometimes establish that the circumstances of the case pose a realistic likelihood of vindictiveness and therefore warrant a prophylactic presumption of vindictiveness in all cases of that type, as occurs, for example, when a prosecutor responds to a defendant's successful appeal by increasing the severity of the charges against him. *See Goodwin*, 457 U.S. at 380-81, 383-84; *Alabama v. Smith*, 490 U.S. 794, 799-800 (1989); *United States v. Kendrick*, 682 F.3d 974, 982 (11th Cir. 2012). Whether a "presumption can ever arise in a pre-trial setting" is unsettled in the Eleventh Circuit, *Barner*, 441 F.3d at 1318, but a presumption would be entirely inappropriate in the circumstances of this case, where the Government sent a putative defendant a target letter, the putative defendant did not accept the routine offer to appear before the grand jury, and the grand jury returned an indictment charging the defendant. If such circumstances were to raise a presumption of vindictiveness, a putative defendant who received a target letter could effectively immunize himself by declining to respond. A presumption of prejudice in those circumstances would be unprecedented and would effectively preclude the issuance of target letters, which are routine and intended to benefit putative defendants.

## CONCLUSION

Nauta has failed to make a showing sufficient to entitle him even to discovery or a hearing, much less dismissal, on his claims of selective and vindictive prosecution. His motion should be denied.

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:     <u>/s/ *Jay I. Bratt*</u>
Jay I. Bratt
Counselor to the Special Counsel
Special Bar ID #A5502946

David V. Harbach, II
Assistant Special Counsel
Special Bar ID #A5503068
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

John M. Pellettieri
Assistant Special Counsel
Special Bar ID #A5503076

March 7, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically transmitted the foregoing document to counsel of record for the defendants via CM/ECF.

/s/ *Jay I. Bratt*
Jay I. Bratt

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 22-mj-8332-BER

### IN RE SEALED SEARCH WARRANT
_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY:   /s/ Michael Thakur
      MICHAEL THAKUR
      Assistant United States Attorney
      Court ID No. A5501474/
      Florida Bar No.: 1011456
      99 Northeast 4th Street
      Miami, Florida 33132-2111
      Telephone: ▮
      E-mail: ▮

Subject to Protective Order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **22-mj-8332-BER**



FILED BY___ *TM* ___D.C.

**Aug 5, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. – West Palm Beach

IN RE: SEARCH WARRANT                    **HIGHLY SENSITIVE DOCUMENT**

_____/

## MOTION TO SEAL

The United States of America, by and through the undersigned Assistant United States

Attorney, hereby moves to seal this Motion, the Search Warrant, and all its accompanying

documents, until further order of this Court. The United States submits that there is good cause

because the integrity of the ongoing investigation might be compromised, and evidence might be

destroyed.

The United States further requests that, pursuant to this Court's procedures for Highly

Sensitive documents, all documents associated with this investigation not be filed on the Court's

electronic docket because filing these materials on the electronic docket poses a risk to safety given

the sensitive nature of the material contained therein.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY:    _s/Michael Thakur_____
MICHAEL THAKUR
Assistant United States Attorney
Court Number A5501474/
Florida Bar No. 1011456
99 Northeast 4th Street
Miami, Florida 33132-2111

Subject to Protective Order                    USA-00043149

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **22-mj-8332-BER**

FILED BY _____ **_TM_** ___ D.C.

**Aug 5, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

IN RE: SEARCH WARRANT                    **HIGHLY SENSITIVE DOCUMENT**
_____/

### SEALING ORDER

The United States of America, having applied to this Court for an Order sealing the Motion

to Seal, the Search Warrant and all its accompanying documents, and this order and the Court

finding good cause:

**IT IS HEREBY ORDERED** that the Motion to Seal, the Search Warrant and its

accompanying documents, and this Order shall be filed under seal until further order of this Court.

However, the United States Attorney's Office and the Federal Bureau of Investigation may obtain

copies of any sealed document for purposes of executing the search warrant.

**DONE AND ORDERED** in chambers at West Palm Beach, Florida, this 5TH day of

August 2022.

HON. BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

Subject to Protective Order

USA-00043150

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

<table>
<tr><td>
In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

the Premises Located at 1100 S. Ocean Blvd., Palm Beach, FL 33480, as further described in Attachment A
</td><td>
)<br>)<br>)<br>)<br>)<br>)
</td><td>

Case No. 22-mj-8332-BER
</td></tr>
</table>

**FILED BY** *TM* **D.C.**

**Aug 5, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the ___Southern___ District of ___Florida___, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 793 | Willful retention of national defense information |
| 18 U.S.C. § 2071 | Concealment or removal of government records |
| 18 U.S.C. § 1519 | Obstruction of federal investigation |

The application is based on these facts:

See attached Affidavit of FBI Special Agent FBI 21A

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days:* ____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

FBI 21A

*Applicant's signature*

FBI 21A , Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___Phone (WhatsApp)___ *(specify reliable electronic means).*

Date: ___08/05/2022___

*Judge's signature*

City and state: ___West Palm Beach, Florida___   Hon. Bruce E. Reinhart, U.S. Magistrate Judge
*Printed name and title*

Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF: | ) | |
| | ) | Case No. |
| LOCATIONS WITHIN THE PREMISES | ) | |
| TO BE SEARCHED IN ATTACHMENT A | ) | **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, ▮▮▮FBI 21A▮▮▮ , being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      The government is conducting a criminal investigation concerning the improper

removal and storage of classified information in unauthorized spaces, as well as the unlawful

concealment or removal of government records. The investigation began as a result of a referral

the United States National Archives and Records Administration (NARA) sent to the United

States Department of Justice (DOJ) on February 9, 2022, hereinafter, "NARA Referral." The

NARA Referral stated that on January 18, 2022, in accordance with the Presidential Records Act

(PRA), NARA received from the office of former President DONALD J. TRUMP, hereinafter

"FPOTUS," via representatives, fifteen (15) boxes of records, hereinafter, the "FIFTEEN

BOXES." The FIFTEEN BOXES, which had been transported from the FPOTUS property at

1100 S Ocean Blvd, Palm Beach, FL 33480, hereinafter, the "PREMISES," a residence and club

known as "Mar-a-Lago," further described in Attachment A, were reported by NARA to contain,

among other things, highly classified documents intermingled with other records.

2.      After an initial review of the NARA Referral, the Federal Bureau of Investigation

(FBI) opened a criminal investigation to, among other things, determine how the documents with

1

Subject to Protective Order

classification markings and records were removed from the White House (or any other authorized location(s) for the storage of classified materials) and came to be stored at the PREMISES; determine whether the storage location(s) at the PREMISES were authorized locations for the storage of classified information; determine whether any additional classified documents or records may have been stored in an unauthorized location at the PREMISES or another unknown location, and whether they remain at any such location; and identify any person(s) who may have removed or retained classified information without authorization and/or in an unauthorized space.

3. The FBI's investigation has established that documents bearing classification markings, which appear to contain National Defense Information (NDI), were among the materials contained in the FIFTEEN BOXES and were stored at the PREMISES in an unauthorized location. Since the FIFTEEN BOXES were provided to NARA, additional documents bearing classification markings, which appear to contain NDI and were stored at the PREMISES in an unauthorized location, have been produced to the government in response to a grand jury subpoena directed to FPOTUS's post-presidential office and seeking documents containing classification markings stored at the PREMISES and otherwise under FPOTUS's control. Further, there is probable cause to believe that additional documents that contain classified NDI or that are Presidential records subject to record retention requirements currently remain at the PREMISES. There is also probable cause to believe that evidence of obstruction will be found at the PREMISES.

4. I am a Special Agent with the FBI assigned to the Washington Field Office counterintelligence division and have been since 2016. During this time, I have received training at the FBI Academy located at Quantico, Virginia, specific to counterintelligence and espionage investigations. I currently am assigned to investigate counterintelligence and espionage matters.

2

Based on my experience and training, I am familiar with efforts used to unlawfully collect, retain, and disseminate sensitive government information, including classified NDI.

5.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1100 S Ocean Blvd, Palm Beach, FL 33480, the "PREMISES," as further described in Attachment A, for the things described in Attachment B.

6.      Based upon the following facts, there is probable cause to believe that the locations to be searched at the PREMISES contain evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793(e), 1519, or 2071.

## SOURCE OF EVIDENCE

7.      The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation, and information obtained from other FBI and U.S. Government personnel.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I, or others, have learned during the course of this investigation.

## STATUTORY AUTHORITY AND DEFINITIONS

8.      Under 18 U.S.C. § 793(e), "[w]hoever having unauthorized possession of, access to, or control over any document . . . or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted" or attempts to do or causes the same "to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee

3

Subject to Protective Order

USA-00043154

of the United States entitled to receive it" shall be fined or imprisoned not more than ten years, or both.

9.      Under Executive Order 13526, information in any form may be classified if it: (1) is owned by, produced by or for, or is under the control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Order [Top Secret, Secret, and Confidential]; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security.

10.      Where such unauthorized disclosure could reasonably result in damage to the national security, the information may be classified as "Confidential" and must be properly safeguarded.  Where such unauthorized disclosure could reasonably result in serious damage to the national security, the information may be classified as "Secret" and must be properly safeguarded.  Where such unauthorized disclosure could reasonably result in exceptionally grave damage to the national security, the information may be classified as "Top Secret" and must be properly safeguarded.

11.      Sensitive Compartmented Information (SCI) means classified information concerning or derived from intelligence sources, methods, or analytical processes, which is required to be handled within formal access control systems.

12.      Special Intelligence, or "SI," is an SCI control system designed to protect technical and intelligence information derived from the monitoring of foreign communications signals by other than the intended recipients.  The SI control system protects SI-derived information and information relating to SI activities, capabilities, techniques, processes, and procedures.

13.      HUMINT Control System, or "HCS," is an SCI control system designed to protect intelligence information derived from clandestine human sources, commonly referred to as

4

USA-00043155

"human intelligence." The HCS control system protects human intelligence-derived information and information relating to human intelligence activities, capabilities, techniques, processes, and procedures.

14. Foreign Intelligence Surveillance Act, or "FISA," is a dissemination control designed to protect intelligence information derived from the collection of information authorized under the Foreign Intelligence Surveillance Act by the Foreign Intelligence Surveillance Court, or "FISC."

15. Classified information may be marked as "Not Releasable to Foreign Nationals/Governments/US Citizens," abbreviated "NOFORN," to indicate information that may not be released in any form to foreign governments, foreign nationals, foreign organizations, or non-U.S. citizens without permission of the originator.

16. Classified information may be marked as "Originator Controlled," abbreviated "ORCON." This marking indicates that dissemination beyond pre-approved U.S. entities requires originator approval.

17. Classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know." Among other requirements, in order for a person to obtain a security clearance allowing that person access to classified United States Government information, that person is required to and must agree to properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations. If a person is not eligible to receive classified information, classified information may not be disclosed to that person. In order for a foreign government to receive

5

Subject to Protective Order

access to classified information, the originating United States agency must determine that such release is appropriate.

18.    Pursuant to Executive Order 13526, classified information contained on automated information systems, including networks and telecommunications systems, that collect, create, communicate, compute, disseminate, process, or store classified information must be maintained in a manner that: (1) prevents access by unauthorized persons; and (2) ensures the integrity of the information.

19.    32 C.F.R. Parts 2001 and 2003 regulate the handling of classified information. Specifically, 32 C.F.R. § 2001.43, titled "Storage," regulates the physical protection of classified information.  This section prescribes that Secret and Top Secret information "shall be stored in a [General Services Administration]-approved security container, a vault built to Federal Standard (FHD STD) 832, or an open storage area constructed in accordance with § 2001.53."  It also requires periodic inspection of the container and the use of an Intrusion Detection System, among other things.

20.    Under 18 U.S.C. § 1519:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

21.    Under 18 U.S.C. § 2071:

(a)  Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined under this title or imprisoned not more than three years, or both.

6

Subject to Protective Order

USA-00043157

(b) Whoever, having the custody of any such record, proceeding, map, book, document, paper, or other thing, willfully and unlawfully conceals, removes, mutilates, obliterates, falsifies, or destroys the same, shall be fined under this title or imprisoned not more than three years, or both; and shall forfeit his office and be disqualified from holding any office under the United States. As used in this subsection, the term "office" does not include the office held by any person as a retired officer of the Armed Forces of the United States.

22.     Under the PRA, 44 U.S.C. § 2201:

(2) The term "Presidential records" means documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President. Such term—

> (A) includes any documentary materials relating to the political activities of the President or members of the President's staff, but only if such activities relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President; but

> (B) does not include any documentary materials that are (i) official records of an agency (as defined in section 552(e) of title 5, United States Code; (ii) personal records; (iii) stocks of publications and stationery; or (iv) extra copies of documents produced only for convenience of reference, when such copies are clearly so identified.

23.     Under 44 U.S.C. § 3301(a), government "records" are defined as:

all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them.

## PROBABLE CAUSE

### *NARA Referral*

24.     On February 9, 2022, the Special Agent in Charge of NARA's Office of the

7

Subject to Protective Order

USA-00043158

Inspector General sent the NARA Referral via email to DOJ. The NARA Referral stated that according to NARA's White House Liaison Division Director, a preliminary review of the FIFTEEN BOXES indicated that they contained "newspapers, magazines, printed news articles, photos, miscellaneous print-outs, notes, presidential correspondence, personal and post-presidential records, and 'a lot of classified records.' Of most significant concern was that highly classified records were unfoldered, intermixed with other records, and otherwise unproperly [*sic*] identified."

      25.    On February 18, 2022, the Archivist of the United States, chief administrator for NARA, stated in a letter to Congress's Committee on Oversight and Reform Chairwoman The Honorable Carolyn B. Maloney, "NARA had ongoing communications with the representatives of former President Trump throughout 2021, which resulted in the transfer of 15 boxes to NARA in January 2022 . . . . NARA has identified items marked as classified national security information within the boxes." The letter also stated that, "[b]ecause NARA identified classified information in the boxes, NARA staff has been in communication with the Department of Justice." The letter was made publicly available at the following uniform resource locator (URL):

https://www.archives.gov/files/foia/ferriero-response-to-02.09.2022-maloney-letter.02.18.2022.pdf. On February 18, 2022, the same day, the Save America Political Action Committee (PAC) posted the following statement on behalf of FPOTUS: "The National Archives did not 'find' anything, they were given, upon request, Presidential Records in an ordinary and routine process to ensure the preservation of my legacy and in accordance with the Presidential Records Act . . . ." An image of this statement is below.

8

Subject to Protective Order

USA-00043159



***FPOTUS Stores Documents in Boxes***

26.     On April 12, 2022, FBI agents interviewed an FPOTUS representative,

"WITNESS ▪." WITNESS ▪ learned from another White House employee, hereinafter referred to

as "_____," that FPOTUS kept boxes in his bedroom in the White

House Residence. Both WITNESS ▪ and _____ heard that FPOTUS

brought documents that he wanted to read to the White House Residence at the end of the day.

WITNESS ▪ reported these documents were placed in boxes that would be stacked in a corner

after FPOTUS was done reading them.

27.     On May 12, 2022, FBI agents interviewed a former employee of FPOTUS,

"WITNESS ▪," who was specifically responsible for handling presidential papers in the White

House. WITNESS ▪ also described a "regular flow of documents" between the White House

9

Residence and Oval Office, carried by the valets, at the direction of FPOTUS.

28.



It was FPOTUS's practice to store accumulated documents in boxes, and that continues to be his practice.

29. In mid-December 2020, WITNESS ▌ was aware from the valets that there were still "several boxes" of records in the White House Residence. WITNESS ▌ brought this to the attention of the FPOTUS Chief of Staff in December 2020. WITNESS ▌ did not know specifically what documents were in those boxes but stated they "could have had anything in them," to include newspaper articles, briefing books, draft press statements, and draft letters. WITNESS ▌ knew that FPOTUS received a daily briefing book, with documents such as schedules, "dos of the day," economic reports, and other matters that were mostly unclassified. Sometimes, the daily briefing book contained classified reports. WITNESS ▌ also regularly handled, on behalf of FPOTUS, decision memo packages that had classified material attached, or

10

talking points for State Department calls, that were classified at the CONFIDENTIAL level at a minimum. WITNESS ▮ did not always receive those documents back and assumed they were handled by other staff. WITNESS ▮ was aware that some of these documents ended up in boxes as that was FPOTUS's "filing system." Sometimes documents that FPOTUS did not return or discard in a burn bag (a common method of disposing of classified documents for appropriate destruction) would be "thrown in a box on the theory that he [FPOTUS] might want to do something with [them] later."

### *Boxes Containing Documents Were Transported from the White House to Mar-a-Lago*

30. According to a CBS Miami article titled "Moving Trucks Spotted At Mar-a-Lago," published Monday, January 18, 2021, at least two moving trucks were observed at the PREMISES on January 18, 2021. On June 9, 2022, FBI agents interviewed a current Mar-a-Lago employee, "WITNESS ▮." WITNESS ▮ recalled that the move had occurred on a Monday morning, when a large moving truck and a box truck were present. Although WITNESS ▮ did not observe Bankers boxes being offloaded from the moving trucks, at a later date, WITNESS ▮ recalled observing Bankers boxes in the White and Gold Ballroom within Mar-a-Lago.

31. On May 26, 2022, the FBI interviewed "WITNESS 5." WITNESS 5 was employed by FPOTUS both during the Administration and after the end of the Administration on January 20, 2021. On June 21, 2022, WITNESS 5 testified under oath before a federal grand jury sitting in the District of Columbia. Before the grand jury, WITNESS 5 stated that during the move from the White House to Mar-a-Lago, Bankers boxes were placed within larger brown boxes labeled "▮▮▮▮."

32. According to WITNESS ▮, WITNESS ▮ subsequently learned that approximately

11

Subject to Protective Order

USA-00043162

eighty-five to ninety-five of FPOTUS's boxes, hereinafter referred to as "FPOTUS BOXES," were transported from the White House to the PREMISES but WITNESS ▮ did not know when this occurred. WITNESS ▮ described the FPOTUS BOXES as white and blue Bankers boxes and cardboard printer paper boxes with lids. WITNESS ▮ confirmed that these boxes are similar to the ones pictured below, in a photograph taken by the media, of FPOTUS aides loading boxes onto Marine One on January 20, 2021, as FPOTUS departed the White House.



33.     On or about the afternoon of January 20, 2021, WITNESS ▮ observed several items, which may have contained some of the FPOTUS BOXES, being offloaded from Air Force One and transported to the PREMISES.

34.     Between January 21, 2021, and late August 2021, the FPOTUS BOXES were stored in at least two different rooms within the PREMISES. WITNESS ▮ was aware that in approximately May 2021, FPOTUS directed Mar-a-Lago staff to locate a permanent storage

12

USA-00043163

location on the PREMISES for his boxes.  In late August or early September 2021, WITNESS ▮ observed the FPOTUS BOXES in a ground floor storage room, hereinafter the "STORAGE ROOM," with no lock on the door.  Sometime thereafter, WITNESS ▮ observed locks installed on the STORAGE ROOM door.

35.     WITNESS ▮ described the STORAGE ROOM as being located on the ground floor pool level in a hallway with other offices and storage spaces.  The door to the STORAGE ROOM was painted gold and had no other markings on it.  The door to the STORAGE ROOM is located approximately mid-way up the wall and is reachable by several wooden stairs.

36.     In addition to the approximately eighty-five to ninety-five FPOTUS BOXES located in the STORAGE ROOM, there were also other boxes in the STORAGE ROOM with merchandise such as challenge coins, garment bags, memorabilia from Mar-a-Lago such as photograph frames, and other décor items.

37.     On May 27, 2022, FBI agents interviewed "WITNESS ▮."  WITNESS ▮ was employed by FPOTUS both during the Administration and after the end of the Administration on January 20, 2021.  WITNESS ▮ described the STORAGE ROOM as located in the basement of the PREMISES.  According to WITNESS ▮, the STORAGE ROOM held file boxes and gifts from the White House deemed too valuable to store off-site.  WITNESS ▮ stated that the entrance to the STORAGE ROOM had a wooden door, which was spray-painted gold.

### *Provision of the Fifteen Boxes to NARA*

38.     On March 31, 2022, the FBI interviewed a White House government employee, "WITNESS ▮."  WITNESS ▮ reported that sometime in 2017, he/she became aware of multiple documents not being delivered to the White House Office of Records Management pursuant to

13

Subject to Protective Order                                                    USA-00043164

PRA requirements for processing. In 2018, WITNESS ▮ learned from WITNESS ▮ that approximately two dozen boxes of materials were being kept by FPOTUS. Another White House employee confirmed to WITNESS ▮ that there was "a separate holding area." After January 20, 2021, WITNESS ▮ was aware that multiple records had not been provided by FPOTUS to NARA, including the approximately two dozen boxes.

39.     On or about May 6, 2021, NARA made a request for the missing PRA records and continued to make requests until approximately late December 2021 when NARA was informed twelve boxes were found and ready for retrieval at the PREMISES. According to WITNESS ▮, after receiving the request from NARA, FPOTUS wanted to review the boxes before providing them to NARA. WITNESS ▮, WITNESS 5, and ▮▮▮▮▮ collected the FIFTEEN BOXES closest to the door of the STORAGE ROOM and delivered them to FPOTUS. They carried the boxes from the STORAGE ROOM to the entryway of FPOTUS's personal residential suite on the PREMISES. Between approximately January 1-17, 2022, WITNESS ▮, WITNESS 5, and ▮▮▮▮▮ placed two to four boxes at a time outside FPOTUS's personal suite.[1] WITNESS ▮ believes that FPOTUS took the boxes into the residential suite and reviewed their contents. On January 17, 2022, the day of the scheduled NARA pick up, WITNESS ▮ saw all FIFTEEN BOXES in the hallway outside FPOTUS's residential suite. WITNESS 5 also testified that the FIFTEEN BOXES were in Pine Hall. Pine Hall is the

[1] When the FBI interviewed WITNESS 5 on May 26, 2022, WITNESS 5 claimed that the first time WITNESS 5 saw the boxes was when WITNESS 5 moved them from Pine Hall, the anteroom to FPOTUS's personal residential suite, to the moving truck to provide the boxes to NARA. WITNESS 5 testified before the grand jury, however, that he/she had actually weeks prior moved them up from the STORAGE ROOM to Pine Hall for FPOTUS's review of them. Further, in WITNESS 5's interview with the FBI on May 26, 2022, he/she had stated that he/she did not know where the boxes had come from prior to being located in Pine Hall. Testifying under oath before the grand jury, WITNESS 5 claimed he/she had said this because he/she was not sure whether the boxes in Pine Hall were the same boxes that he/she had moved from the STORAGE ROOM. WITNESS 5 thereafter admitted, however, that he/she was not aware of anyone moving any other such boxes to Pine Hall.

14

anteroom to FPOTUS's personal residential suite.

40.     WITNESS ▮ believed that FPOTUS personally reviewed the items requested by
NARA.

41.     WITNESS 5 testified that he/she and WITNESS ▮ transferred the boxes from Pine
Hall to WITNESS 5's car. From there, on January 17, 2022, WITNESS ▮ and WITNESS 5 met
the NARA contract driver and provided the driver with the FIFTEEN BOXES.

42.     Even though there were far more FPOTUS BOXES than the FIFTEEN BOXES,
FPOTUS did not review the remainder of the FPOTUS BOXES before the NARA pickup.
According to WITNESS 5, the FIFTEEN BOXES were not selected from the FPOTUS BOXES
for review in a systematic way. WITNESS 5 testified before the grand jury that WITNESS 5
would "just open the door, turn to my left, grab a box, and take it up." WITNESS 5 confirmed
that he/she was not instructed to take any particular boxes, and WITNESS 5 answered
affirmatively when asked if WITNESS 5 would "just pick some off the top." When WITNESS 5
was questioned why he/she did not bring for review more than what WITNESS 5 approximated
was 15 to 17 boxes, WITNESS 5 testified that "once I started putting them in there – [FPOTUS]
was like, okay, that's it." According to WITNESS 5, FPOTUS did not state why he did not want
to review more boxes before the NARA pickup, but whenever WITNESS 5 asked whether
FPOTUS wanted WITNESS 5 to get any more boxes, FPOTUS would say, "Nope, that's it."

43.     According to WITNESS ▮, after providing the FIFTEEN BOXES to NARA,
FPOTUS indicated to his staff those were the boxes going to NARA and "there are no more."

44.     According to WITNESS ▮, around the time the FIFTEEN BOXES were provided
to NARA, FPOTUS directed WITNESS ▮ to convey to one of FPOTUS's lawyers, hereinafter

15

USA-00043166

"INDIVIDUAL 1," that there were no more boxes at the PREMISES.

45.     According to WITNESS ▮, however, approximately seventy to eighty of the aforementioned eighty-five to ninety-five FPOTUS BOXES remained in the STORAGE ROOM as of approximately January 2022. WITNESS ▮ did not know the contents of the remaining seventy to eighty FPOTUS BOXES, but believed they contain the same types of documents and records as the FIFTEEN BOXES that were provided to NARA.

46.     On May 18, 2022, the FBI obtained an undated photograph, hereinafter referred to as the "STORAGE-PHOTO," from WITNESS ▮, who had access to the STORAGE ROOM. WITNESS ▮ took the photograph and provided it to FPOTUS sometime between January 1-17, 2022. The purpose of the photograph was to show FPOTUS the volume of boxes that remained in the STORAGE ROOM. The STORAGE-PHOTO, which appears below, captures approximately sixty-one of the FPOTUS BOXES located in the STORAGE ROOM:



Subject to Protective Order

### *The FIFTEEN BOXES Provided to NARA Contain Classified Information*

47.     From May 16-18, 2022, FBI agents conducted a preliminary review of the

FIFTEEN BOXES provided to NARA and identified documents with classification markings in

fourteen of the FIFTEEN BOXES. A preliminary triage of the documents with classification

markings revealed the following approximate numbers: 184 unique documents bearing

classification markings, including 67 documents marked as CONFIDENTIAL, 92 documents

marked as SECRET, and 25 documents marked as TOP SECRET. Further, the FBI agents

observed markings reflecting the following compartments/dissemination controls: HCS, FISA,

ORCON, NOFORN, and SI. Based on my training and experience, I know that documents

classified at these levels typically contain NDI. Several of the documents also contained what

appears to be FPOTUS's handwritten notes.

48.     Given WITNESS ▮'s statements that the FIFTEEN BOXES were a sampling taken

from the larger amount of approximately eighty-five to ninety-five FPOTUS BOXES being stored

in the STORAGE ROOM at the PREMISES, I believe the contents of the remainder of the

FPOTUS BOXES are similar to the contents of the FIFTEEN BOXES. Further, based upon the

presence and number of documents and records bearing classification markings discovered within

the FIFTEEN BOXES provided to NARA, there is reason to believe the remaining FPOTUS

BOXES, from which the FIFTEEN BOXES were taken, contain classified NDI.

### *Following the Provision of the FIFTEEN BOXES to NARA, Remaining FPOTUS BOXES Were Moved from the STORAGE ROOM to Other Locations at the Premises*

49.     On June 21, 2022, while testifying under oath before the grand jury, WITNESS 5

stated that sometime after January 2022 (i.e., after the provision of the FIFTEEN BOXES to

NARA), FPOTUS requested that additional boxes be moved from the STORAGE ROOM to Pine

17

USA-00043168

Hall. FPOTUS would say, "bring me a couple boxes," and WITNESS 5 would "grab them and just put them in Pine Hall."

50. According to WITNESS 5, WITNESS 5 was not asked to nor did he/she return boxes to the STORAGE ROOM. WITNESS 5 confirmed he/she had been in the STORAGE ROOM recently. WITNESS 5 acknowledged that when he/she was in there recently, there were fewer boxes in the STORAGE ROOM than represented in the STORAGE-PHOTO. When asked how WITNESS 5 would account for the deficit in the number of boxes in the STORAGE ROOM compared to the number of boxes in the STORAGE-PHOTO, WITNESS 5 stated that the remaining boxes were "in his room in the residence," referring to FPOTUS's residential suite at the PREMISES.

### *Grand Jury Subpoena, Related Correspondence, and Production of Additional Classified Documents*

51. DOJ has advised me that, on May 11, 2022, an attorney representing FPOTUS, "FPOTUS COUNSEL 1," agreed to accept service of a grand jury subpoena from a grand jury sitting in the District of Columbia sent to him via email by one of the prosecutors handling this matter for DOJ, "DOJ COUNSEL." The subpoena was directed to the custodian of records for the Office of Donald J. Trump, and it requested the following materials:

> Any and all documents or writings in the custody or control of Donald J. Trump and/or the Office of Donald J. Trump bearing classification markings, including but not limited to the following: Top Secret, Secret, Confidential, Top Secret/SI-G/NOFORN/ORCON, Top Secret/SI-G/NOFORN, Top Secret/HCS-O/NOFORN/ORCON, Top Secret/HCS-O/NOFORN, Top Secret/HCS-P/NOFORN/ORCON, Top Secret/HCS-P/NOFORN, Top Secret/TK/NOFORN/ORCON, Top Secret/TK/NOFORN, Secret/NOFORN, Confidential/NOFORN, TS, TS/SAP, TS/SI-G/NF/OC, TS/SI-G/NF, TS/HCS-O/NF/OC, TS/HCS-O/NF, TS/HCS-P/NF/OC, TS/HCS-P/NF, TS/HCS-P/SI-G, TS/HCS-P/SI/TK, TS/TK/NF/OC, TS/TK/NF, S/NF, S/FRD, S/NATO, S/SI, C, and C/NF.

18

USA-00043169

The return date of the subpoena was May 24, 2022. DOJ COUNSEL also sent FPOTUS COUNSEL 1 a letter that permitted alternative compliance with the subpoena by "providing any responsive documents to the FBI at the place of their location" and by providing from the custodian a "sworn certification that the documents represent all responsive records." The letter further stated that if no responsive documents existed, the custodian should provide a sworn certification to that effect.

52.     On May 25, 2022, while negotiating for an extension of the subpoena, FPOTUS COUNSEL 1 sent two letters to DOJ COUNSEL. In the second such letter, which is attached as Exhibit 1, FPOTUS COUNSEL 1 asked DOJ to consider a few "principles," which include FPOTUS COUNSEL 1's claim that a President has absolute authority to declassify documents. In this letter, FPOTUS COUNSEL 1 requested, among other things, that "DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation."

53.     I am aware of an article published in *Breitbart* on May 5, 2022, available at https://www.breitbart.com/politics/2022/05/05/documents-mar-a-lago-marked-classified-were-already-declassified-kash-patel-says/, which states that Kash Patel, who is described as a former top FPOTUS administration official, characterized as "misleading" reports in other news organizations that NARA had found classified materials among records that FPOTUS provided to NARA from Mar-a-Lago. Patel alleged that such reports were misleading because FPOTUS had declassified the materials at issue. WITNESS ▮ was aware Patel visited FPOTUS at the PREMISES around the time the *Breitbart* article was published, though WITNESS ▮ was not present at any meetings between Patel and FPOTUS.

54.     On May 26, 2022, and on June 7, 2022, FBI agents interviewed "WITNESS ▮."

19

WITNESS ▇ was employed by FPOTUS during the Administration. WITNESS ▇ believed FPOTUS had declassified records related to the FBI's investigation of what WITNESS ▇ referred to as "Russiagate." WITNESS ▇ was not aware of additional records being declassified in the manner Patel claimed in the aforementioned *Breibart* article. WITNESS ▇ opined that the President of the United States could declassify classified information without concurrence from, or coordination with, the owner of the information. In some instances, WITNESS ▇ related, like those involving the Atomic Energy Act, there may be statutes that purport to establish a framework for declassifying classified information.

55. After an extension was granted for compliance with the subpoena, on the evening of June 2, 2022, FPOTUS COUNSEL 1 contacted DOJ COUNSEL and requested that FBI agents meet him the following day to pick up responsive documents. On June 3, 2022, three FBI agents and DOJ COUNSEL arrived at the PREMISES to accept receipt of the materials. In addition to FPOTUS COUNSEL 1, another individual, hereinafter "INDIVIDUAL 2," was also present as the custodian of records for FPOTUS's post-presidential office. The production included a single Redweld envelope, wrapped in tape, containing documents. FPOTUS COUNSEL 1 relayed that the documents in the Redweld envelope were found during a review of the boxes located in the STORAGE ROOM. INDIVIDUAL 2 provided a Certification Letter, signed by INDIVIDUAL 2, which stated the following:

> Based upon the information that has been provided to me, I am authorized to certify, on behalf of the Office of Donald J. Trump, the following: a. A diligent search was conducted of the boxes that were moved from the White House to Florida; b. This search was conducted after receipt of the subpoena, in order to locate any and all documents that are responsive to the subpoena; c. Any and all responsive documents accompany this certification; and d. No copy, written notation, or reproduction of any kind was retained as to any responsive document.

56. During receipt of the production, FPOTUS COUNSEL 1 stated he was advised all

20

the records that came from the White House were stored in one location within Mar-a-Lago, the STORAGE ROOM, and the boxes of records in the STORAGE ROOM were "the remaining repository" of records from the White House. FPOTUS COUNSEL 1 further stated he was not advised there were any records in any private office space or other location in Mar-a-Lago. The agents and DOJ COUNSEL were permitted to see the STORAGE ROOM and observed that approximately fifty to fifty-five boxes remained in the STORAGE ROOM. Considering that only FIFTEEN BOXES had been provided to NARA of the approximately eighty-five to ninety-five FPOTUS BOXES that had been located in the STORAGE ROOM, it appears that approximately fifteen to thirty of the FPOTUS BOXES had previously been relocated elsewhere. The FBI agents also observed that the composition of boxes differed such that fewer Bankers boxes were visible, while more plain cardboard boxes and storage bins were present. Other items were also present in the STORAGE ROOM, including a coat rack with suit jackets, as well as interior décor items such as wall art and frames.

57. While testifying before the grand jury, WITNESS 5 stated that he did not know whether FPOTUS COUNSEL 1 reviewed any of the boxes that were in FPOTUS's residential suite, but he did not see FPOTUS COUNSEL1 go in there.

58. A preliminary review of the documents contained in the Redweld envelope produced pursuant to the grand jury subpoena revealed the following approximate numbers: 38 unique documents bearing classification markings, including 5 documents marked as CONFIDENTIAL, 16 documents marked as SECRET, and 17 documents marked as TOP SECRET. Further, the FBI agents observed markings reflecting the following caveats/compartments, among others: HCS, SI, and FISA. Based on my training and experience, I know that documents classified at these levels typically contain NDI. Multiple documents also

21

USA-00043172

contained what appears to be FPOTUS's handwritten notes.

59.     Notably, although the FIFTEEN BOXES provided to NARA contained approximately 184 unique documents with classification markings, only approximately 38 unique documents with classification markings were produced from the remaining FPOTUS BOXES.

60.     When producing the documents, neither FPOTUS COUNSEL 1 nor INDIVIDUAL 2 asserted that FPOTUS had declassified the documents.[2] The documents being in a Redweld envelope wrapped in tape appears to be consistent with an effort to handle the documents as if they were still classified.

61.     On June 8, 2022, DOJ COUNSEL sent FPOTUS COUNSEL 1 a letter, which reiterated that the PREMISES are not authorized to store classified information and requested the preservation of the STORAGE ROOM and boxes that had been moved from the White House to the PREMISES.  Specifically, the letter stated in relevant part:

> As I previously indicated to you, Mar-a-Lago does not include a secure location authorized for the storage of classified information.  As such, it appears that since the time classified documents (the ones recently provided and any and all others) were removed from the secure facilities at the White House and moved to Mar-a-Lago on or around January 20, 2021, they have not been handled in an appropriate manner or stored in an appropriate location.  Accordingly, we ask that the room at Mar-a-Lago where the documents had been stored be secured and that all of the boxes that were moved from the White House to Mar-a-Lago (along with any other items in that room) be preserved in that room in their current condition until further notice.

---

[2] 18 U.S.C. § 793(e) does not use the term "classified information," but rather criminalizes the unlawful retention of "information relating to the national defense." The statute does not define "information related to the national defense," but courts have construed it broadly. *See Gorin v. United States*, 312 U.S. 19, 28 (1941) (holding that the phrase "information relating to the national defense" as used in the Espionage Act is a "generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness"). In addition, the information must be "closely held" by the U.S. government. *See United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000) ("[I]nformation made public by the government as well as information never protected by the government is not national defense information."); *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988).  Certain courts have also held that the disclosure of the documents must be potentially damaging to the United States. *See Morison*, 844 F.2d at 1071-72.

Subject to Protective Order

USA-00043173

On June 9, 2022, FPOTUS COUNSEL 1 sent an email to DOJ COUNSEL, stating, "I write to acknowledge receipt of this letter."

### *Surveillance Camera Footage Shows Boxes Being Removed from the Storage Room Area Prior to FPOTUS Counsel 1's Review in Connection With the Subpoena*

62.     DOJ COUNSEL has advised me that on or about June 22, 2022, counsel for the

Trump Organization, a group of business entities associated with FPOTUS, confirmed that the

Trump Organization maintains security cameras in the vicinity of the STORAGE ROOM and that

on June 24, 2022, counsel for the Trump Organization agreed to accept service of a grand jury

subpoena for footage from those cameras.

63.     The subpoena was served on counsel on June 24, 2022, directed to the Custodian

of Records for the Trump Organization, and sought:

> Any and all surveillance records, videos, images, photographs, and/or CCTV from
> internal cameras located on ground floor (basement) and outside the room known as "Pine
> Hall" on the Mar-a-Lago property located at 1100 S Ocean Blvd., Palm Beach, FL 33480
> from the time period of January 10, 2022 to present.

64.     On July 6, 2022, in response to this subpoena, representatives of the Trump

Organization provided a hard drive to FBI agents.

Upon review

of the hard drive, the FBI determined that the drive contained video footage from four cameras in

the basement hallway of the PREMISES in which the door to the STORAGE ROOM is located.

The footage on the drive begins on April 23, 2022, and ends on June 24, 2022. The recording

feature of the cameras appears to be motion activated, so that footage is only captured when

motion is detected within each camera's field of view.

23

65.     One camera in particular, identified on the hard drive as "South Tunnel Liquor," provides a view of entry and exit into a room (hereafter ANTEROOM) that leads to the STORAGE ROOM. The doorway to the ANTEROOM itself is not visible in the camera view, as a refrigerator is directly between the camera and doorway, but the footage from this camera nonetheless establishes entry and exit to the ANTEROOM because it is apparent when persons within the camera's field of view turn directly behind the refrigerator and then disappear from view. The ANTEROOM, in addition to its entrance from the South Tunnel, has approximately four doors leading off it, one of which is the gold-painted door that leads to the STORAGE ROOM. The ANTEROOM provides the only entrance to the STORAGE ROOM; however, other offices can also be entered from the ANTEROOM, so it might be possible for persons to enter the STORAGE ROOM from those other offices without being visible in the surveillance camera footage.

66.     By reviewing the camera footage provided by the Trump Organization in response to the subpoena, the FBI has determined the following:

> On May 24, 2022, WITNESS 5 is observed exiting the ANTEROOM doorway with three boxes.
>
> On May 30, 2022, four days after WITNESS 5's interview with the FBI during which the location of boxes was a significant subject of questioning, WITNESS 5 is observed exiting the ANTEROOM doorway with approximately fifty Bankers boxes, consistent with the description of the FPOTUS BOXES. FBI did not observe this quantity of boxes being returned to the STORAGE ROOM through the ANTEROOM entrance in its review of the footage.
>
> The next day, on June 1, 2022, WITNESS 5 is observed carrying eleven brown cardboard boxes out the ANTEROOM entrance. One box did not have a lid on it and appeared to contain papers.
>
> The day after that, on June 2, 2022, WITNESS 5 is observed moving twenty-five to thirty boxes, some of which were brown cardboard boxes and others of which were Bankers boxes consistent with the description of the FPOTUS BOXES, into the entrance of the

24

USA-00043175

ANTEROOM. Approximately three and a half hours later, WITNESS 5 is observed escorting FPOTUS COUNSEL 1 in through the entrance of the ANTEROOM, and FPOTUS COUNSEL 1 is not observed leaving until approximately two and a half hours later.

On June 3, 2022, FPOTUS COUNSEL 1 is escorted through the ANTEROOM entrance by an unidentified individual wearing a jacket with "USSS POLICE" printed on the back. The unidentified individual and FPOTUS COUNSEL 1 exit the ANTEROOM entrance moments later. FPOTUS COUNSEL 1 appeared to be carrying a Redweld envelope after exiting the ANTEROOM.

67.     As described above, FPOTUS COUNSEL 1 contacted DOJ COUNSEL on June 2, 2022, asking FBI agents to meet FPOTUS COUNSEL 1 the following day. As also described above, on June 3, 2022, FPOTUS COUNSEL 1 in response to a grand jury subpoena provided to FBI agents and DOJ COUNSEL a Redweld envelope containing documents bearing classification markings.

68.     As described above in paragraphs 31 and 49, on June 21, 2022, WITNESS 5 testified before a federal grand jury in the District of Columbia. According to FBI's review of video footage, and as detailed in paragraph 66, WITNESS 5 can be observed removing approximately 64 boxes from the STORAGE ROOM area between May 24 and June 1, 2022, but only returning 25-30 boxes to the STORAGE ROOM area on June 2, 2022. Notably, and as described above in paragraph 51, these boxes were removed following service of a grand jury subpoena but before FPOTUS COUNSEL 1's review of boxes in the STORAGE ROOM area to locate documents responsive to the subpoena.

69.     During his grand jury testimony on June 21, 2022, WITNESS 5 was asked to identify the occasions on which he had entered the STORAGE ROOM after October 2021, and he testified that "a lot of times" he would store "shirts, and hats, [and] stickers" in the STORAGE ROOM at FPOTUS's behest. When asked if he had removed anything from the STORAGE

25

USA-00043176

ROOM at any time, WITNESS 5 testified that "recently," meaning "within the last month" prior to his June 21, 2022 testimony, he removed a box of challenge coins from the STORAGE ROOM and took them to FPOTUS's office. He did not identify any other occasion on which he had removed anything from the STORAGE ROOM and did not inform the grand jury that, within the month prior to his grand jury appearance, WITNESS 5 had removed approximately sixty boxes from the STORAGE ROOM.

### *There is Probable Cause to Believe That Documents Containing Classified NDI and Presidential Records Remain at the Premises*

70.      As explained above, the FPOTUS BOXES contained numerous documents with classification markings, both in the FIFTEEN BOXES and in the remaining FPOTUS BOXES. As also explained above, the classified documents provided to the government in a Redweld envelope pursuant to the subpoena were represented to have been stored in boxes located in the STORAGE ROOM, and based on FPOTUS COUNSEL 1's statements relayed in paragraph 55-56 above, I believe it is very likely that FPOTUS COUNSEL 1 did not search for classified information in other locations at the PREMISES. The investigation has established, however, that classified information was possessed in other areas of the PREMISES and that other FPOTUS BOXES, which are likely to contain similar contents to the FIFTEEN BOXES, were moved from the STORAGE ROOM to other locations in the PREMISES, including FPOTUS's residential suite and Pine Hall, between the time that the FIFTEEN BOXES were provided to NARA and when FPOTUS COUNSEL 1 conducted his review for classified information of the remaining FPOTUS BOXES in the STORAGE ROOM.

71.      Since FPOTUS left the White House in January 2021, WITNESS ▮ has observed, on several occasions, FPOTUS with documents containing classification markings on his desk at

Subject to Protective Order

the "45 Office," an office space used by FPOTUS and certain staffers that is located within the PREMISES. Since June 3, 2022, however, WITNESS ▮ has not observed documents at the PREMISES with classification markings.

72.     When WITNESS 5 was questioned under oath as to whether there were Bankers boxes remaining in the residential suite as of the time of his testimony – June 21, 2022 – WITNESS 5 said that to his knowledge, there were remaining boxes. WITNESS 5 at first claimed that there were "maybe two, three boxes in there," but when pressed on whether there were "[j]ust two or three," caveated his answer with "everything happens fast." WITNESS 5 then confirmed that he had taken multiple boxes since January 2022 to FPOTUS's private residence, and that FPOTUS had not asked him to take them back (i.e., return them to the STORAGE ROOM).

73.     On or about June 10, 2022, approximately one week after FPOTUS departed Mar-a-Lago for Bedminster, New Jersey, where FPOTUS typically spends time over the summer, WITNESS ▮ entered the STORAGE ROOM and observed noticeable differences in the types of boxes and organization since the prior time WITNESS ▮ was in the STORAGE ROOM. WITNESS ▮ expressed the last time he/she previously observed the STORAGE ROOM was "around the time the truck driver came," which I interpreted was a reference to the January 17, 2022 retrieval by NARA of the FIFTEEN BOXES. WITNESS ▮ explained that when FPOTUS COUNSEL 1 accessed the STORAGE ROOM to conduct his review, it appeared that he was alone, and "his hands were empty" when he entered. Although WITNESS ▮ was unable to comment on whether sufficient time existed for FPOTUS COUNSEL 1 to conduct a thorough review of the records located in the STORAGE ROOM, WITNESS ▮ expressed the time required to change the room to its current state "would have taken a full day I would estimate" and "that would have been very surprising to me for [FPOTUS COUNSEL 1] to have done that

27

Subject to Protective Order

organization." As indicated above, the video footage reveals that FPOTUS COUNSEL 1 was in the STORAGE ROOM area for only about two and a half hours on June 2, 2022.

74.    On June 29, 2022, FBI agents interviewed a current employee of the PREMISES, "WITNESS █" Sometime after June 10, 2022, WITNESS █ was contacted by FPOTUS COUNSEL 1 and asked whether there was a "better way to secure [the STORAGE ROOM]." WITNESS █ understood FPOTUS COUNSEL 1's request was per a DOJ requirement. As of June 29, 2022, a padlock was installed on the STORAGE ROOM door.

75.    WITNESS █ described FPOTUS's residential suite, referred to as the Owners' Quarters, as accessible via steel sliding doors. The first room is known as Pine Hall, which serves as a sitting room. Pine Hall then accesses a hallway known as French Hall. From within French Hall, there are two available doors. The door to the left leads to FPOTUS's personal suite, and the door to the right leads to FPOTUS's spouse's personal suite. Those two suites are additionally connected by a door between them. As of approximately June 26, 2022, WITNESS █ was present in FPOTUS's suite for maintenance purposes, but did not recall observing boxes in that location. On June 30, 2022, WITNESS █ informed the FBI, via legal counsel representing WITNESS █, that the dimensions of FPOTUS's personal suite are approximately 16 feet by 28 feet, and the dimensions of FPOTUS's spouse's personal suite are approximately 20 feet by 28 feet. WITNESS █'s legal counsel confirmed that WITNESS █ may not have been able to fully observe the entirety of the FPOTUS's personal suite on June 26, 2022.

76.    On July 29, 2022, FBI agents interviewed an individual who has worked at the PREMISES since ▬▬▬▬▬ hereinafter "WITNESS █." WITNESS █ informed the FBI that he/she is regularly in the residential suite at the PREMISES, and that as recently as July 28, 2022, WITNESS █ did not observe any Bankers boxes or boxes of documents currently in the

28

USA-00043179

residential suite or the Pine Hall anteroom to the residential suite. WITNESS ▇ did indicate that there have been occasions in the past in which he/she has observed a few Bankers boxes at a time in either the residential suite or Pine Hall. WITNESS ▇ stated he/she has never seen more than three boxes at a time, even though WITNESS 5 and others have informed the FBI that the FIFTEEN BOXES were in Pine Hall prior to being delivered to NARA.

77.     Based upon this investigation, I believe that the STORAGE ROOM, FPOTUS's residential suite, Pine Hall, the "45 Office," and other spaces within the PREMISES are not currently authorized locations for the storage of classified information or NDI. Similarly, based upon this investigation, I do not believe that any spaces within the PREMISES have been authorized for the storage of classified information at least since the end of FPOTUS's Presidential Administration on January 20, 2021.

78.     As described above, evidence of the SUBJECT OFFENSES has been stored in multiple locations at the PREMISES. In addition, as described in paragraph 66 among other paragraphs, the video footage reflects that evidence has been moved recently: WITNESS 5 removed approximately 64 boxes from the STORAGE ROOM area between May 24 and June 1, 2022, but only returned 25-30 boxes to the STORAGE ROOM area on June 2, 2022. It cannot be seen on the video footage where the boxes were moved when they were taken from the STORAGE ROOM area, and accordingly, the current location of the boxes that were removed from the STORAGE ROOM area but not returned to it is unknown. WITNESS 5 did not reveal during his FBI interview or his grand jury testimony that he had moved the boxes recently or give an indication as to their current location. Additionally, no witness has indicated that boxes have left the PREMISES since the provision of the FIFTEEN BOXES to NARA on January 17, 2022. Accordingly, this affidavit seeks authorization to search the "45 Office" and all storage rooms and

29

USA-00043180

any other rooms or locations where boxes or records may be stored within the PREMISES, as further described in Attachment A. The PREMISES is currently closed to club members for the summer; however, as specified in Attachment A, if at the time of the search, there are areas of the PREMISES being occupied, rented, or used by third parties, and not otherwise used or available to be used by FPOTUS and his staff, the search would not include such areas.

## CONCLUSION

79.     Based on the foregoing facts and circumstances, I submit that probable cause exists to believe that evidence, contraband, fruits of crime, or other items illegally possessed in violation 18 U.S.C. §§ 793(e), 2071, or 1519 will be found at the PREMISES. Further, I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

80.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and the FBI has not yet identified all potential criminal confederates nor located all evidence related to its investigation. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by allowing criminal parties an opportunity to flee, destroy evidence (stored electronically and otherwise), change patterns of behavior, and notify criminal confederates.

30

## SEARCH PROCEDURES FOR HANDLING POTENTIAL ATTORNEY-CLIENT PRIVILEGED INFORMATION

The following procedures will be followed at the time of the search in order to protect against disclosures of attorney-client privileged material:

81.     These procedures will be executed by: (a) law enforcement personnel conducting this investigation (the "Case Team"); and (b) law enforcement personnel not participating in the investigation of the matter, who will search the "45 Office" and be available to assist in the event that a procedure involving potentially attorney-client privileged information is required (the "Privilege Review Team").

82.     The Case Team will be responsible for searching the **TARGET PREMISES**. However, the Privilege Review Team will search the "45 Office" and conduct a review of the seized materials from the "45 Office" to identify and segregate documents or data containing potentially attorney-client privileged information.

83.     If the Privilege Review Team determines the documents or data are not potentially attorney-client privileged, they will be provided to the law-enforcement personnel assigned to the investigation.   If at any point the law-enforcement personnel assigned to the investigation subsequently identify any data or documents that they consider may be potentially attorney-client privileged, they will cease the review of such identified data or documents and refer the materials to the Privilege Review Team for further review by the Privilege Review Team.

84.     If the Privilege Review Team determines that documents are potentially attorney-client privileged or merit further consideration in that regard, a Privilege Review Team attorney may do any of the following: (a) apply *ex parte* to the court for a determination whether or not the documents contain attorney-client privileged material; (b) defer seeking court intervention and

31

continue to keep the documents inaccessible to law-enforcement personnel assigned to the

investigation; or (c) disclose the documents to the potential privilege holder, request the privilege

holder to state whether the potential privilege holder asserts attorney-client privilege as to any

documents, including requesting a particularized privilege log, and seek a ruling from the court

regarding any attorney-client privilege claims as to which the Privilege Review Team and the

privilege-holder cannot reach agreement.

Respectfully submitted,

FBI 21A

Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me by
telephone (WhatsApp) or other reliable electronic
means this ___5___ day of August, 2022:

HON. BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

32

Subject to Protective Order

# EXHIBIT 1

Subject to Protective Order

USA-00043184



**SILVERMAN**
**THOMPSON**
Silverman Thompson Slutkin White

**ATTORNEYS AT LAW**

*A Limited Liability Company*
400 East Pratt Street – Suite 900
Baltimore, Maryland 21202
Telephone 410.385.2225
Facsimile 410.547.2432
**silvermanthompson.com**
*Baltimore | Towson | New York | Washington, DC*

Writer's Direct Contact:
Evan Corcoran
410-385-2225
ecorcoran@silvermanthompson.com

May 25, 2022

*Via Electronic Mail*

Jay I. Bratt, Esquire
Chief
Counterintelligence & Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania, Avenue, N.W.
Washington, D.C. 20530

Re:    Presidential Records Investigation

Dear Jay:

I write on behalf of President Donald J. Trump regarding the above-referenced matter.

Public trust in the government is low. At such times, adherence to the rules and long-standing policies is essential. President Donald J. Trump is a leader of the Republican Party. The Department of Justice (DOJ), as part of the Executive Branch, is under the control of a President from the opposite party. It is critical, given that dynamic, that every effort is made to ensure that actions by DOJ that may touch upon the former President, or his close associates, do not involve politics.

There have been public reports about an investigation by DOJ into Presidential Records purportedly marked as classified among materials that were once in the White House and unknowingly included among the boxes brought to Mar-a-Lago by the movers. It is important to emphasize that when a request was made for the documents by the National Archives and Records Administration (NARA), President Trump readily and voluntarily agreed to their transfer to NARA. The communications regarding the transfer of boxes to NARA were friendly, open, and straightforward. President Trump voluntarily ordered that the boxes be provided to NARA. No legal objection was asserted about the transfer. No concerns were raised about the contents of the boxes. It was a voluntary and open process.

Unfortunately, the good faith demonstrated by President Trump was not matched once the boxes arrived at NARA. Leaks followed. And, once DOJ got involved, the leaks continued. Leaks about any investigation are concerning. Leaks about an investigation that involve the residence of a former President who is still active on the national political scene are particularly troubling.

Subject to Protective Order

Jay I. Bratt
May 25, 2022
Page **2** of **3**

It is important to note a few bedrock principles:

### (1) A President Has Absolute Authority To Declassify Documents.

Under the U.S. Constitution, the President is vested with the highest level of authority when it comes to the classification and declassification of documents. *See* U.S. Const., Art. II, § 2 ("The President [is] Commander in Chief of the Army and Navy of the United States[.]"). His constitutionally-based authority regarding the classification and declassification of documents is unfettered. *See Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[The President's] authority to classify and control access to information bearing on national security . . . flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant.").

### (2) Presidential Actions Involving Classified Documents Are Not Subject To Criminal Sanction.

Any attempt to impose criminal liability on a President or former President that involves his actions with respect to documents marked classified would implicate grave constitutional separation-of-powers issues. Beyond that, the primary criminal statute that governs the unauthorized removal and retention of classified documents or material *does not apply* to the President. That statute provides, in pertinent part, as follows:

> Whoever, being an officer, employee, contractor, or consultant of the United States, and, by virtue of his office, employment, position, or contract, becomes possessed of documents or materials containing classified information of the United States, knowingly removes such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location shall be fined under this title or imprisoned for not more than five years, or both.

18 U.S.C. § 1924(a). An element of this offense, which the government must prove beyond a reasonable doubt, is that the accused is "an officer, employee, contractor, or consultant of the United States." The President is none of these. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 497–98 (2010) (citing U.S. Const., Art. II, § 2, cl. 2) ("The people do not vote for the 'Officers of the United States.'"); *see also Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 518–19 (D.D.C. 1986), *aff'd*, 836 F.2d 561 (D.C. Cir. 1987) ("[a]n officer of the United States can only be appointed by the President, by and with the advice and consent of the Senate, or by a court of law, or the head of a department. A person who does not derive his position from one of these sources is not an officer of the United States in the sense of the Constitution."). Thus, the statute does not apply to acts by a President.

2

Subject to Protective Order

USA-00043186

Jay I. Bratt
May 25, 2022
Page **3** of **3**

### (3) DOJ Must Be Insulated From Political Influence.

According to the Inspector General of DOJ, one of the top challenges facing the Department is the public perception that DOJ is influenced by politics. The report found that "[o]ne important strategy that can build public trust in the Department is to ensure adherence to policies and procedures designed to protect DOJ from accusations of political influence or partial application of the law." *See* https://oig.justice.gov/reports/top-management-and-performance-challenges-facing-department-justice-2021 (last visited May 25, 2022). We request that DOJ adhere to long-standing policies and procedures regarding communications between DOJ and the White House regarding pending investigative matters which are designed to prevent political influence in DOJ decision-making.

### (4) DOJ Must Be Candid With Judges And Present Exculpatory Evidence.

Long-standing DOJ policy requires that DOJ attorneys be candid in representations made to judges. Pursuant to those policies, we request that DOJ provide this letter to any judicial officer who is asked to rule on any motion pertaining to this investigation, or on any application made in connection with any investigative request concerning this investigation.

The official policy of DOJ further requires that prosecutors present exculpatory evidence to a grand jury. Pursuant to that policy, we request that DOJ provide this letter to any grand jury considering evidence in connection with this matter, or any grand jury asked to issue a subpoena for testimony or documents in connection with this matter.

Thank you for your attention to this request.

With best regards,

M. Evan Corcoran

cc:     Matthew G. Olsen
        Assistant Attorney General
        National Security Division
        *Via Electronic Mail*

3

Subject to Protective Order

USA-00043187

## ATTACHMENT A

*Property to be searched*

The premises to be searched, 1100 S Ocean Blvd, Palm Beach, FL 33480, is further described as a resort, club, and residence located near the intersection of Southern Blvd and S Ocean Blvd. It is described as a mansion with approximately 58 bedrooms, 33 bathrooms, on a 17-acre estate. The locations to be searched include the "45 Office," all storage rooms, and all other rooms or areas within the premises used or available to be used by FPOTUS and his staff and in which boxes or documents could be stored, including all structures or buildings on the estate. It does not include areas currently (i.e., at the time of the search) being occupied, rented, or used by third parties (such as Mar-a-Largo Members) and not otherwise used or available to be used by FPOTUS and his staff, such as private guest suites.

1

## ATTACHMENT B

*Property to be seized*

All physical documents and records constituting evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793, 2071, or 1519, including the following:

a. Any physical documents with classification markings, along with any containers/boxes (including any other contents) in which such documents are located, as well as any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes;

b. Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

c. Any government and/or Presidential Records created between January 20, 2017, and January 20, 2021; or

d. Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential Records, or of any documents with classification markings.

2

Subject to Protective Order

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | |
| *or identify the person by name and address)* ) | Case No.   22-mj-8332-BER |
| the Premises Located at 1100 S. Ocean Blvd., Palm ) | |
| Beach, FL 33480, as further described in Attachment A ) | |
| ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____Florida_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____August 19, 2022_____   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Duty Magistrate_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   8/5/22   12:12 pm   *Bruce Reinhart*
*Judge's signature*

City and state:   West Palm Beach, FL   Hon. Bruce Reinhart, U.S. Magistrate Judge
*Printed name and title*

Subject to Protective Order

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br><br>22-mj-8332-BER | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subject to Protective Order

USA-00043191

## ATTACHMENT A

*Property to be searched*

The premises to be searched, 1100 S Ocean Blvd, Palm Beach, FL 33480, is further described as a resort, club, and residence located near the intersection of Southern Blvd and S Ocean Blvd.  It is described as a mansion with approximately 58 bedrooms, 33 bathrooms, on a 17-acre estate.  The locations to be searched include the "45 Office," all storage rooms, and all other rooms or areas within the premises used or available to be used by FPOTUS and his staff and in which boxes or documents could be stored, including all structures or buildings on the estate.  It does not include areas currently (i.e., at the time of the search) being occupied, rented, or used by third parties (such as Mar-a-Largo Members) and not otherwise used or available to be used by FPOTUS and his staff, such as private guest suites.

Subject to Protective Order

## ATTACHMENT B

*Property to be seized*

All physical documents and records constituting evidence, contraband, fruits of crime, or other items illegally possessed in violation of 18 U.S.C. §§ 793, 2071, or 1519, including the following:

a. Any physical documents with classification markings, along with any containers/boxes (including any other contents) in which such documents are located, as well as any other containers/boxes that are collectively stored or found together with the aforementioned documents and containers/boxes;

b. Information, including communications in any form, regarding the retrieval, storage, or transmission of national defense information or classified material;

c. Any government and/or Presidential Records created between January 20, 2017, and January 20, 2021; or

d. Any evidence of the knowing alteration, destruction, or concealment of any government and/or Presidential Records, or of any documents with classification markings.

2

Subject to Protective Order

# EXHIBIT 2

```
 1

 2

 3

 4

 5

 6                    RECORDED INTERVIEW BETWEEN

 7   SPECIAL AGENT  [FBI 21A]  , SPECIAL AGENT  [FBI 41]  , AUSA

 8        MICHAEL THAKUR,  [Per. 10]  , and JOHN IRVING,

 9

10                  File: 220113_1110.mp3

11

12             Date:  January 13, 2023

13

14

15

16

17

18

19

20

21

22

23

24

25
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Subject to Protective Order                                    USA-00817429

1    (01:38:55)

2              SA FBI 21A   PowerPoint?  Okay.  Did you ever get

3    recurring training, whether it was every year or something?

4              Per. 10 :  No.

5              SA FBI 21A   No?  That was just one time?

6              Per. 10 :  One time.

7              SA FBI 21A   Okay.  Did they -- when you left the

8    White House, did they give you any kind of, like, a debrief,

9    or --

10             Per. 10    They gave us these forms.

11             SA FBI 21A   Okay.  All right.  And did they -- any

12   kind of training as for any brief on what you can and cannot

13   do with classified?

14             Per. 10    I'm sure they did.  They read us a

15   little speech.

16             SA FBI 21A :  Okay.

17             Per. 10 :  And they gave us a form.

18             SA FBI 21A   All right.  So these documents, I

19   think you had probably told your attorney and whatnot, but

20   just so I can have it for the record, how did the documents

21   essentially get onto your laptop?

22             Per. 10   Scanned them.

23             SA FBI 21A   Okay.  And you performed the scan?

24             Per. 10   Um-hum.

25             SA FBI 21A   When did you scan?

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Subject to Protective Order

USA-00817528

```
 1    (01:39:52)

 2              ███ Per. 10    September 2021.

 3         SA  FBI 21A   September 2021?  Okay.

 4         MR. THAKUR:  Through the beginning of October?

 5              ███ Per. 10    Beginning of October, yeah.

 6         SA  FBI 21A   Okay.  Who directed you to scan the

 7    documents?

 8              ███ Per. 10      Per. 34

 9         SA  FBI 21A   Okay.  Do you remember the reason why

10    the contents of this box had to be scanned?

11              ███ Per. 10 :  So we can have an electronic copy of

12    our records.

13         SA  FBI 21A   Okay.  Were there any other boxes that

14    had to be scanned?

15              ███ Per. 10    No.

16         SA  FBI 21A   It was just that one?

17              ███ Per. 10    Yeah.

18         SA  FBI 21A   Okay.  What did you use --

19         MR. THAKUR:  Why just this one?  I mean, there

20    were obviously other boxes there.

21         SA  FBI 21A   Because that was his -- the only

22    record of his schedule.

23         MR. THAKUR:  Okay.

24         SA  FBI 21A    And did you understand it to be his

25    schedule when he was present at the White House?
```

Subject to Protective Order

USA-00817529

```
 1    (01:40:46)

 2              ████  Per. 10     Um-hum.

 3              SA  ████ FBI      Okay.  What did you use to scan the

 4    documents?

 5              ████  Per. 10     The Adobe Scan app.

 6              SA  ████ FBI 21A   All right.  And apps, we're talking

 7    about a mobile device?  Okay.  What device?

 8              ████  Per. 10  :  My personal phone.

 9              SA  ████ FBI 21A   Okay.  So how did the scanning work

10    when you -- you made an image of some kind --

11              ████  Per. 10     Um-hum.

12              SA  ████ FBI 21A   -- correct?  Okay.  Did the image save

13    onto your phone at any point?

14              ████  Per. 10     No.  So you'd put your phone over a

15    piece of paper.  It uses your camera and it creates a PDF --

16              SA  ████ FBI 21A   Okay.

17              ████  Per. 10  :  -- on that image.  But it doesn't

18    save that image.

19              SA  ████ FBI 21A   Okay.  So that scan -- that digital

20    file, whatever it is, that -- where does it get saved?

21              ████  Per. 10     I think, to the Adobe Cloud.  Like,

22    it's all in the app.

23              SA  ████ FBI 21A   Okay.  So your phone is a middleman,

24    but it never actually saves?  It just sort of affects --

25              ████  Per. 10     (Indiscernible 1:41:42).
```

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Subject to Protective Order                                    USA-00817530

```
 1      (01:41:43)

 2            SA  FBI 21A    -- the image and --

 3                  Per. 10     Yeah.

 4            SA  FBI 21A    -- directly puts it to the cloud?

 5                  Per. 10     To my knowledge, yeah.

 6            SA  FBI 21A    Okay.

 7                  Per. 10     I don't know how apps work, but

 8      that's my understanding of how it works.

 9            SA  FBI 21A    Okay.

10            MR. THAKUR:  Did you set up that Adobe Cloud

11      account?

12                  Per. 10     Yes.

13            MR. THAKUR:  Okay.  Approximately when?

14                  Per. 10     When I first started.

15            MR. THAKUR:  Okay.

16            SA  FBI 21A    Started working on this project?  Or

17      started working for the 45 Office?

18                  Per. 10     For the office.

19            SA  FBI 21A    For the office?  Okay.

20            MR. THAKUR:  So that would've been around July of

21      2021?

22                  Per. 10     Um-hum.

23            MR. THAKUR:   Okay.  And why did you create it?

24                  Per. 10  :  So I could scan notes.

25            MR. THAKUR:  Okay.  What kind of notes?
```

Subject to Protective Order                                                USA-00817531

```
 1    (02:00:39)

 2           MR. THAKUR:  -- handwriting on some of the

 3    schedules.  That's not your handwriting --

 4           ▇ Per. 10 :   No.

 5           MR. THAKUR:  -- on any of it?  Okay.  Okay.  And I

 6    guess, when did you first become aware of the box?

 7           ▇ Per. 10 :   In September.

 8           MR. THAKUR:  Of 2021?

 9           ▇ Per. 10    Like, well -- I think it was

10    September.  I don't remember exactly.

11           MR. THAKUR:  Okay.  So --

12           SA FBI 21A   We're talking about the year of 2021?

13           ▇ Per. 10    Yeah, yeah.

14           SA FBI 21A   Oh, okay.

15           MR. THAKUR:  So shortly before you were asked to

16    scan it is when --

17           ▇ Per. 10    Yeah.  When the project was first

18    introduced to me --

19           MR. THAKUR:  Okay.

20           ▇ Per. 10 :   -- is when I learned about it.

21           MR. THAKUR:  Okay.  And did you see it, I guess --

22    where it was being kept at that time?

23           ▇ Per. 10    Yes.

24           MR. THAKUR:  Okay.  And where was that?

25           ▇ Per. 10    Under Per. 34  desk.
```

Subject to Protective Order                                        USA-00817552

```
 1    (02:01:31)

 2             MR. THAKUR:  Okay.  All right.  And so that's in

 3    the 45 Office?

 4             ████  Per. 10    Um-hum.

 5             MR. THAKUR:  Okay.

 6             SA  FBI 21A    The desk that you're sitting at now?

 7             ████  Per. 10 :  Um-hum.

 8             MR. THAKUR:  Okay.

 9             SA  FBI 21A :  Okay.

10             MR. THAKUR:  Got it.  And did  P. 34  say anything

11    about it -- about where this came from or the contents of

12    it?

13             ████  Per. 10 :  Just that it was the schedule from

14    the White House.

15             MR. THAKUR:  Okay.  Did you talk to the President

16    at all about the scanning project?

17             ████  Per. 10 :  No.

18             MR. THAKUR:  Okay.  And then what I understand

19    from your attorney (indiscernible 2:02:11) I guess, confirm

20    from you -- where did you take the box to have it scanned?

21             ████  Per. 10 :  To the tennis cottage.

22             MR. THAKUR:  Okay.  And tell us a little bit more

23    about the tennis cottage.  How big is that?  Is that, like,

24    one room?  Or --

25             ████  Per. 10    It's one room.
```

Subject to Protective Order                                          USA-00817553

```
 1    (02:08:21)

 2              MR. THAKUR:  Yeah.

 3              ▓ Per. 10 :  Yeah, basically.

 4              MR. THAKUR:  And so when it was under your desk,

 5    did anyone else look through the box or --

 6              ▓ Per. 10 :  No.

 7              MR. THAKUR:  -- open the box?

 8              ▓ Per. 10 :   Not to my knowledge.

 9              MR. THAKUR:  Right.  Okay.  And how long did it

10    stay under your desk?

11              ▓ Per. 10 :  Till we moved to Flagler.

12              MR. THAKUR:  Okay.  And when was that?

13              ▓ Per. 10 :  November 2022.

14              MR. THAKUR:  Okay.  And in the Flagler office,

15    where did the box go?

16              ▓ Per. 10 :  Under my desk.

17              SA ▓ FBI 21A :  And you said you moved to Flagler in

18    November 2022?

19              ▓ Per. 10 :  Oh, '21.

20              SA ▓ FBI 21A :  '21?  Okay.  Yeah.  The New Year, my

21    dates are a little off too.

22              MR. THAKUR:  All right.  And when it was in

23    Flagler, was anything done with that box?

24              ▓ Per. 10 :  No.

25              MR. THAKUR:  Okay.  No one, including yourself --
```

Subject to Protective Order                                            USA-00817559

```
 1    (02:09:18)

 2              MR. THAKUR:  -- opened it or --

 3          [Per. 10]:  Uh-uh.

 4              MR. THAKUR:  -- had a need to get to it?

 5          [Per. 10]:  No.

 6              MR. THAKUR:  Okay.

 7              MR. IRVING:  To your knowledge?

 8          [Per. 10]:  To my knowledge.

 9              MR. THAKUR:  To your knowledge, obviously.

10          [Per. 10]:  To my knowledge.

11              MR. THAKUR:  Yeah.  And how long did it stay under

12    your desk there?

13          [Per. 10]:  Till I moved to Mar-a-Lago.

14              MR. THAKUR:  Okay.  And when was that?

15          [Per. 10]:  Late August to September 2022.

16              MR. THAKUR:  Okay.  So the box never went to

17    Bedminster to your knowledge?

18          [Per. 10]:  No.

19              MR. THAKUR:  Okay.  And you basically just brought

20    everything that was on or near your desk to Mar-a-Lago?

21    Everything that you were working with --

22          [Per. 10]:  Um-hum.

23              MR. THAKUR:  -- kind of came with you?  Okay.  And

24    then once it came -- once you moved to Mar-a-Lago, where did

25    the box go?
```

Subject to Protective Order                                                    USA-00817560

```
 1     (02:10:14)

 2              [Per. 10]:  Under my desk.

 3              MR. THAKUR:  Okay.  And at that point, this is

 4     [Per. 34]'s desk?

 5              [Per. 10]:  Um-hum.

 6              MR. THAKUR:  So it's kind of come, I guess, full

 7     circle, back to the same desk.

 8              SA [FBI 21A]:  Brought it home.

 9              MR. THAKUR:  Okay.  And then how did it -- so this

10     was never in the 45 Office closets?

11              [Per. 10]:  No.

12              MR. THAKUR:  Okay.

13              [Per. 10]:  Not to my knowledge.

14              MR. THAKUR:  Right.  Okay.  And then when this was

15     found in mid-December, were you there the day that it was

16     found?

17              [Per. 10]:  Yes.

18              MR. THAKUR:  Okay.  I guess, tell us a little bit

19     about that day and what you witnessed in terms of the

20     search.

21              [Per. 10]:  I met the lawyers in the morning to

22     let them into the office.

23              MR. THAKUR:  Okay.

24              [Per. 10]:  And then I left because I didn't want

25     to be there.
```

Subject to Protective Order                                        USA-00817561

```
 1    (02:11:05)

 2             MR. THAKUR:  Okay.

 3             SA [FBI 21A]:  Because they were lawyers?

 4             [Per. 10]:  They were searching the office.

 5             MR. THAKUR:  Well, I get that.

 6             MR. IRVING:  I don't like us either.

 7             MR. THAKUR:  And so at some point, did they ask

 8    you any questions about the box?

 9             [Per. 10]:  Not that I remember.

10             MR. THAKUR:  Okay.

11             MR. IRVING:  When is this?

12             MR. THAKUR:  This is mid-December, so probably --

13             [Per. 10]:  (Indiscernible 2:11:35).

14             MR. THAKUR:  -- December 15th is the day of the

15    search.

16             MR. IRVING:  Okay.  And so you let the lawyers in?

17             [Per. 10]:  I think it was more recent than that,

18    but maybe.

19             MR. THAKUR:  Okay.  Yeah.  My understanding was

20    the box was found kind of mid-December.  The laptop,

21    obviously, was more recent.  But do you remember something

22    differently?

23             [Per. 10]:  It was all at the same time, I

24    thought.

25             MR. THAKUR:  Like, the laptop was as well?  Do --
```

Subject to Protective Order

1   (02:12:05)

2        MR. THAKUR:  -- you -- I guess, do you know if

3   your laptop was searched at the same time?

4            **Per. 10** :  No.

5        MR. THAKUR:  Okay.

6            **Per. 10** :  They weren't searched on the same

7   day.

8        MR. THAKUR:  Okay.  Were they searching

9   electronics at the time?  Electronic devices?

10            **Per. 10** :  No.

11        MR. THAKUR:  Okay.  And then -- so at one point, I

12   guess, did anyone tell you or ask you anything about that

13   box, after the search?

14            **Per. 10** :  That day.

15        MR. THAKUR:  Okay.  And what was said that day?

16        MR. IRVING:  I mean, if you're asking for

17   communications between a lawyer and the employee, the

18   substance of the communications -- but I also want to be --

19   yeah.

20        MR. THAKUR:  Well, I guess -- well, let me ask

21   this.  When did you first learn that there was classified

22   documents in that box?

23        MR. IRVING:  That's fair.

24            **Per. 10** :  I think that -- earlier that day.

25        MR. THAKUR:  Okay.

Subject to Protective Order                              USA-00817563

1    (02:13:20)

2         MR. IRVING:  What was the answer?

3         ███ Per. 10 :  I think, later that day.

4         MR. THAKUR:  Okay.

5         SA  FBI 41 :  Later the day of the search?

6         MR. THAKUR:  Okay.  And did one of the searchers

7    tell you that?  Or one of the attorneys?

8         ███ Per. 10 :  I don't remember who told me first.

9         MR. THAKUR:  Okay.  And I guess, at what point did

10   you find out that your laptop had the same documents?  Or

11   did you tell anyone, I guess, that your laptop had these

12   documents?

13        ███ Per. 10 :  I was told that the lawyers were

14   going to come back and get the box to take a scan of it, and

15   they said oh, I already have a scan of it.

16        MR. THAKUR:  Okay.  But when you were told that

17   they would come back to get a scan of it, that was not the

18   same day or the same week, right?

19        ███ Per. 10 :  They came sometime later in the

20   month --

21        MR. THAKUR:  Okay.

22        ███ Per. 10 :  -- or the same week.  I don't know.

23        MR. THAKUR:  Okay.

24        ███ Per. 10 :  I don't remember.

25        MR. THAKUR:  Got it.

Subject to Protective Order

1   (02:14:26)

2              [Per. 10]:   It was (indiscernible 2:14:27) --

3              MR. IRVING:   So they're going to scan the box.

4   You're like --

5              [Per. 10]:   Well, I already have copies.   Take

6   the scanned copy.

7              MR. THAKUR:   Okay.

8              MR. IRVING:   And then -- go ahead.

9              SA [FBI 21A]:   I'm sorry.   I just want to make sure I

10  understood something.   So after it was discovered that the

11  box contained classified --

12             [Per. 10]:   Um-hum.

13             SA [FBI 21A]:   -- the attorneys wanted to take the

14  box so that they could perform a scan?

15             [Per. 10]:   They took --

16             MR. IRVING:   So, I think --

17             MR. THAKUR:   Two different points, right?   They

18  searched it.   And then at a later point, maybe a week or so

19  later, they then told you they were going to scan the box

20  because -- that they were going to scan the contents of the

21  box?   Is that --

22             MR. IRVING:   Let me just ask you to ask this stuff

23  of [P. 60], right?

24             MR. THAKUR:   Okay.

25             MR. IRVING:   Because my understanding is that --

FREE STATE REPORTING, INC.
Court Reporting   Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Subject to Protective Order                                    USA-00817565

1    (02:15:21)

2            MR. IRVING:  -- P60 removed the classified

3    materials --

4            MR. THAKUR:  Right.

5            MR. IRVING:  -- told you guys about it.

6            MR. THAKUR:  Right.

7            MR. IRVING:  And I think what we're talking about

8    is a scan of the box, minus those --

9            MR. THAKUR:  Correct, yes.

10           MR. IRVING:  So --

11           MR. THAKUR:  Okay.

12           MR. IRVING:  -- you know?

13           SA FBI 21A:  Yeah.

14           MR. THAKUR:  Okay.

15           SA FBI 21A :  Yeah.

16           MR. IRVING:  Do you have any first-hand knowledge

17   about any of that?

18           Per. 10 :  I mean, not other than when they said

19   they were going to come tomorrow to take the box.  Can you

20   meet them in the morning?

21           MR. IRVING:  Okay.  And was that when you were

22   saying --

23           Per. 10 :  I have it scanned in already.

24           MR. IRVING:  Okay.

25           MR. THAKUR:  Okay.  Got it.  Okay.

Subject to Protective Order                                    USA-00817566

1    (02:15:55)

2         MR. IRVING:  But that would've been the original

3    scan that would've presumably included the classified

4    documents?

5         [Per. 10]:  Um-hum.

6         MR. THAKUR:  Okay.

7         MR. IRVING:  Hence the flash drive.

8         MR. THAKUR:  Right.  Okay.  Do you know -- I

9    guess, how many -- because you gave us -- you gave the FBI

10   the laptop, what, last Saturday, I think?

11        [Per. 10]:  Yeah.  Last weekend.

12        MR. THAKUR:  Last weekend.  And so how many days

13   or so before then did you first tell someone that you had

14   the laptop with the scans on it?

15        [Per. 10]:  Like, the day or two days before.

16        MR. THAKUR:  Okay.

17        [Per. 10]:  It all happened in, like, 24 hours.

18        MR. THAKUR:  Got it.  Do you know of anyone else

19   at Mar-a-Lago or the 45 Office who was scanning documents?

20        [Per. 10]:  No.

21        MR. THAKUR:  Okay.  So to your knowledge, no other

22   box like that was scanned?  I know you said earlier you

23   didn't scan anything, but --

24        [Per. 10]:  Yeah.

25        MR. THAKUR:  -- do you have --

Subject to Protective Order                                    USA-00817567

1    (02:16:55)

2            ███ Per. 10 :   To my knowledge.

3            MR. THAKUR:  -- any sense that anyone else

4    would've scanned documents like that?

5            ███ Per. 10 :   (No audible response.)

6            MR. THAKUR:  And then so after it was discovered,

7    did you talk to anyone to find out more about the classified

8    documents there?  Like, how -- when they were placed there

9    or anything else about the box?  Like, did you ask Per. 34 --

10   like, Per. 34 , did you know there were classified documents in

11   there?

12           ███ Per. 10 :   No.

13           MR. THAKUR:  Okay.  And no other similar

14   conversation with anyone else in the office?

15           ███ Per. 10 :   No.

16           MR. THAKUR:  Okay.

17           SA FBI 41 :   May I clarify one point?  I understand

18   the box was found in the closet, but on the day of the

19   search, was it still your understanding the box was under

20   your desk?

21           MR. THAKUR:  No.  It was not found in the closet,

22   right?

23           SA FBI 41 :   Oh.  It was not found in the closet?

24           MR. THAKUR:  Is that -- to your understanding, it

25   was still under your desk when they searched --

Subject to Protective Order                                    USA-00817568

```
 1    (02:17:53)
 2              [Per. 10]:  It was --
 3          MR. THAKUR:  -- in December?
 4              [Per. 10]:  -- in my desk.  And then we decided
 5    that a box under my desk looked messy, so we put it in the
 6    gift closet, which is still inside the office.
 7          MR. THAKUR:  I see.  So -- but that was sort of
 8    the day --
 9              [Per. 10]:  But that's different --
10          MR. THAKUR:  That was --
11              [Per. 10]:  -- from the other closet.
12          MR. THAKUR:  I see.  So -- but that was sort of
13    the day of the search, in mid-December, it was moved to the
14    closet?
15              [Per. 10]:  Probably, like, the week before.
16          MR. THAKUR:  Okay.
17              [Per. 10]:  We were cleaning up the office.
18          MR. THAKUR:  I see.  Okay.
19          SA [FBI 41]:  So the week before the search, it went
20    from under your desk to a gift closet?
21              [Per. 10]:  Yes.  That's in the office.
22          SA [FBI 41]:  In the tennis cottage?  Or in the
23    45 --
24          MR. THAKUR:  You're talking about the 45 Office,
25    right?
```

Subject to Protective Order

USA-00817569

1    (02:18:32)

2              ███ Per. 10 :   Yeah.   I'm sorry.

3              MR. THAKUR:   Okay.

4              SA FBI 41 :   So two different closets though, in

5    the 45 Office?

6              ███ Per. 10 :   No.

7              SA FBI 21A :   Because I know when you walk into --

8              MS. HARRIS:   (Indiscernible 2:18:39) --

9              SA FBI 21A :   -- the President's office, the first

10   door on your left is his restroom, and then there's another

11   closet right next to it.   Is that the closet we're talking

12   about?

13             ███ Per. 10 :   In his specific office?

14             SA FBI 21A :   Um-hum.

15             ███ Per. 10 :   His restroom and the closet, yeah.

16             SA FBI 21A :   That one?   Okay.

17             ███ Per. 10 :   The gift closet.

18             SA FBI 21A :   That's the gift closet?   Okay.

19             SA FBI 41 :   But we're unclear on when it made its

20   way from the gift closet in the 45 Office to that closet,

21   which we'll now call the second closet.

22             SA FBI 21A :   I think it's only been one closet.

23             SA FBI 41 :   And maybe I'm misunderstanding.   I'm

24   sorry.

25             MR. IRVING:   That's why --

Subject to Protective Order                                    USA-00817570

```
 1    (02:19:12)

 2              SA [FBI 41]:  So --

 3                   [Per. 10]:  It went -- the box went from under

 4    [Per. 34]  desk to the tennis cottage, the tennis cottage to

 5    Flagler, Flagler to under my desk, under my desk to the

 6    closet, which is still in the office.

 7              SA [FBI 41]:  I see.

 8              SA [FBI 21A]:  Yeah.

 9              SA [FBI 41]:  And that is the only closet in this

10    whole conversation?

11                   [Per. 10]:  Yes.  He earlier asked me if that box

12    was in the bathroom, I think.

13              MR. THAKUR:  Right, yeah.

14                   [Per. 10]:  That's outside the office --

15              MR. THAKUR:  Um-hum.

16                   [Per. 10]:  -- that we used to use as storage.

17              SA [FBI 41]:  I see.

18              MR. THAKUR:  And to your knowledge, it was not

19    (indiscernible 2:19:47) --

20                   [Per. 10]:  It was not, to my knowledge.

21              MR. THAKUR:  Okay.  Got it.  Okay.

22              MR. IRVING:  But it did go into the gift closet?

23                   [Per. 10]:  Yes.  Because I use that now for

24    storage (indiscernible 2:19:56).

25              MR. IRVING:  And when was that, approximately?
```

Subject to Protective Order                                      USA-00817571

1    (02:19:59)

2              Per. 10   :   Probably, we were cleaning out the

3    office a week before.

4              MR. IRVING:  A week before what?

5              Per. 10   :   Before they came.

6              SA  FBI 21A :   The searchers?

7              Per. 10   :   Yeah.

8              MR. THAKUR:  Do you know -- I guess, when it was

9    under  Per. 34 's desk or really at any time after the

10   presidency, do you know if the President asked to look at

11   anything from that box?

12             Per. 10   :   Not to my knowledge.

13             MR. THAKUR:  Okay.

14             SA  FBI 41 :   Thank you for walking through all

15   that.

16             SA  FBI 21A :   And when you were going through -- and

17   this is just -- this more, like, standard operating

18   questions.  When you were going through the scan of these

19   individual papers, do you remember seeing anything that had

20   classification labels?

21             Per. 10   :   Uh-uh.

22             SA  FBI 21A :   Okay.  Was anyone else with you also

23   looking at the same papers as you were scanning them?

24             Per. 10   :   There were other people in the

25   office, but no one was looking at them.

Subject to Protective Order                                    USA-00817572

1    (02:36:38)

2              MR. THAKUR:  Do you know -- even before the

3    summer, do you know if the President ever went down to the

4    storage room?

5              ███ Per. 10 :  To my knowledge, he never went in

6    there.

7              MR. IRVING:  There was one other movement on the

8    box?

9              ███ Per. 10 :  Um-hum.

10             MR. IRVING:  Because you guys are trying to sort

11   of account for the box at every -- you know, and I get that.

12   But did you move the box at any time out of the 45 Office in

13   the last -- shortly before it was discovered?  Just --

14             ███ Per. 10 :  Yeah.  When we were cleaning out the

15   office, I -- we were cleaning out, like, pictures and stuff,

16   and moving out, make the guest closet, like, nice and all of

17   that.  Took the box.  We were going to put it in storage.

18   And then I realized, like, the lawyers have never, like,

19   seen this box.  So let's make sure it's good.  So we brought

20   it back to the office instead of putting it in storage.

21             MR. THAKUR:  Okay.  So you did actually bring it

22   to storage and then took it back?  Or --

23             ███ Per. 10 :  Oh, it never went in storage.

24             MR. THAKUR:  Okay.

25             ███ Per. 10 :  We never --

Subject to Protective Order                                    USA-00817588

1    (02:38:03)

2         MR. THAKUR:  It was just discussions of it, but it

3    actually didn't move --

4              [Per. 10]:  We took it out of the office, put it

5    in a car, and then brought it back --

6         MR. THAKUR:  Okay.

7              [Per. 10]:  -- to the office.

8         MR. THAKUR:  Got it.  Whose car?

9              [Per. 10]:  [Per. 11's]  car.

10        MR. THAKUR:  Okay.  Is this  [Per. 11]?

11   Okay.  And how long was it in [P. 11] car?

12             [Per. 10]:  One day.

13        MR. THAKUR:  Okay.  You were going to take it to

14   Life Storage or to the storage room at Mar-a-Lago?

15             [Per. 10]:  To Life Storage.

16        MR. THAKUR:  Okay.

17             [Per. 10]:  Just to put it in the archives or

18   library storage unit because it looked messy under my desk,

19   having boxes in the office.

20        MR. THAKUR:  Okay.

21             [Per. 10]:  So trying to organize the office.

22        MR. THAKUR:  Um-hum.

23             [Per. 10]:  Bring it there, yeah.

24        MR. THAKUR:  Okay.

25        SA [FBI 21A]:  When it was in [P. 11] car, you said --

Subject to Protective Order                                    USA-00817589

```
 1    (02:38:53)

 2              SA [FBI 21A]:  -- like, overnight?

 3              [  ] [Per. 10]:  I believe so.

 4              SA [FBI 21A]:  Okay.  And it's [P.11] personal car,

 5    so --

 6              [  ] [Per. 10]:  Um-hum.

 7              SA [FBI 21A]:  -- we're all assuming personal car,

 8    you take it home after work?

 9              [  ] [Per. 10]:  Um-hum.

10              SA [FBI 21A]:  But it just stays in [P. 11] --

11              [  ] [Per. 10]:  Trunk.

12              SA [FBI 21A]:  -- residential area?  Okay.  Until [P11]

13    brings the car back?

14              [  ] [Per. 10]:  Um-hum.

15              SA [FBI 21A]:  Okay.

16              SA [FBI 41]:  And what prompted the cleaning of the

17    office?

18              [  ] [Per. 10]:  The office looked messy.  We were

19    talking about what value did we provide in our, like, new

20    jobs and positions.  If we can -- there had been complaints.

21    No one had food.  No one had snacks.  Like, you're in the

22    office all day and you're not eating until 7, 8 p.m. at

23    night.  So trying to turn one of the bathrooms that we used

24    as storage into a snack room, and just then clean up his

25    gift closet because it just had lots of random things.
```

Subject to Protective Order

```
 1    (02:39:48)

 2              ▮▮ Per. 10 :  There was lots of arts laying around.

 3    Just trying to make it look more presidential.

 4              SA FBI 21A :  Okay.

 5              SA FBI 41 :  Got you.  And then first heads-up call

 6    for you thinking about bringing the box back in, I want to

 7    make sure that I have the reason (indiscernible 2:40:03).

 8    You said that the lawyers hadn't checked the box yet?

 9              ▮▮ Per. 10 :  Uh-uh.

10              SA FBI 41 :  And what do you mean by that?

11              ▮▮ Per. 10 :  Well, I didn't want it to seem like

12    we were moving things when people were coming in to do the

13    searches for this, like, investigation.

14              MR. THAKUR:  Right.

15              ▮▮ Per. 10 :  The idea was Per. 34 wanted the box

16    under my (indiscernible 2:40:25) to stay with a staffer.

17              MR. THAKUR:  Um-hum.

18              ▮▮ Per. 10 :  Because it was considered more

19    personal.

20              MR. THAKUR:  Yeah.

21              ▮▮ Per. 10 :  But the idea was presented to me --

22    Per. 34 is not here.  What do you want to do with it?  I

23    didn't want it in the office.  I couldn't -- like, it was

24    that dire to have to have --

25              MR. THAKUR:  Yeah.
```

Subject to Protective Order                                          USA-00817591

1  (02:40:42)

2           ███ Per. 10 :  -- under my desk.

3           MR. THAKUR:  Okay.

4           ███ Per. 10 :  So --

5           MR. THAKUR:  Was this the only box that was under

6   your desk?

7           ███ Per. 10 :  Um-hum.

8           MR. THAKUR:  Okay.

9           MR. IRVING:  So just to make sure I got this

10  straight.  So this whole -- like, starts with Per. 34 gives

11  you the project?  Then Per. 34 tells you that this is a box

12  that, you know, contains confidential, you know, in a

13  non-classified sense --

14          MR. THAKUR:  Um-hum.

15          MR. IRVING:  You know --

16          ███ Per. 10 :  Personal.

17          MR. IRVING:  -- personal information, right?

18          ███ Per. 10 :  Um-hum.

19          MR. IRVING:  So that's why P34 wants you to keep

20  it under your desk?

21          ███ Per. 10 :  Um-hum.

22          MR. IRVING:  And you do that all along.  And then

23  Per. 34 's not there anymore?

24          ███ Per. 10 :  Um-hum.

25          MR. IRVING:  And so you're -- you guys --

Subject to Protective Order                                    USA-00817592

 1   (02:41:15)

 2          MR. IRVING:  -- somebody, you and who else was

 3   cleaning?   ██ P. 11 ?

 4          ██ Per. 10 :   P. 11   was there and Walt was there.

 5          MR. IRVING:  Okay.  And so that's going on.  The

 6   box is still under your desk.  You're thinking that looks

 7   messy, but --

 8          ██ Per. 10 :  Um-hum.

 9          MR. IRVING:  -- you're thinking Per. 34 said to keep

10   it close -- you know, close (indiscernible 2:41:44) --

11          ██ Per. 10 :  So that's why I (indiscernible

12   2:41:35).

13          MR. IRVING:  But Per. 34 not there anymore?

14          ██ Per. 10 :  Yeah.  Like --

15          MR. IRVING:  Okay.  I'm just making sure I

16   understand.  So then you decide that it's going to go to

17   storage, the library storage?  And then you --

18          ██ Per. 10 :  Um-hum.

19          MR. IRVING:  You thought better of it and took it

20   back?

21          ██ Per. 10 :  Um-hum.

22          MR. IRVING:  Okay.

23          MR. THAKUR:  And this was -- you said about a week

24   or so, or two days before the December 15th search?

25          ██ Per. 10 :  Um-hum.  I didn't know they were --

Subject to Protective Order                              USA-00817593

1        ***C E R T I F I C A T E***

2              I, ████████████████ and ████████████, certify

3   that the foregoing is a true and correct transcript, to the

4   best of my ability, of the above pages, of the RECORDED

5   AUDIO INTERVIEW provided to me by the Department of Justice,

6   Washington, D.C.

7              I further certify that I am neither counsel for,

8   related to, nor employed by any of the parties to the action

9   in which this recording was taken, and further that I am not

10  financially nor otherwise interested in the outcome of the

11  action.

12

13  January 24, 2023
    Date

14                              Transcriber

15  January 24, 2023
    Date

16                              Transcriber

17

18  January 26, 2023
    Date

                                Auditor

19

20              Within this transcript of proceedings, some of the

21  names and/or technical terms are spelled phonetically,

22  inasmuch as exhibits, files and supporting documentation

23  were not made available to us for reference.

24

25

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

Subject to Protective Order                                    USA-00817620

# EXHIBIT 3
# FILED UNDER SEAL

# (SEE ECF 482)